SIEGFRIED BIENENSTOK and HERMAN BIENENSTOK, Respondents, *v.* EDWARD H. AMMIDOWN and ALBERT D. SMITH, Defendants; ALBERT D. SMITH, Appellant.

1. PARTNERSHIP — AGENCY. Although the principle of agency applies to copartners, yet it is only when it can be seen that a partner is, in fact, acting as an agent of his copartners, that he binds them.

2. CESSATION OF AGENCY. Where an agent commits an independent fraud for his own benefit he ceases to act as an agent for his principal, the ordinary presumption of a communication between them fails, and the principal is not affected with constructive notice of the agent's knowledge.

3. COPARTNER NOT AFFECTED WITH CONSTRUCTIVE NOTICE. Notice or knowledge of one member of a partnership, acquired in transactions outside of the partnership business, conducted for his individual benefit, is not constructively imputable to his copartners and imposes no implied liability upon them through the partnership relation.

4. Copartner not Liable to Third Party through Outside Acts of Partner. A member of a firm of commission merchants, who was also the president of an insolvent manufacturing company which w̲as indebted to his firm for advances on goods consigned for sale, obtained a loan from a bank for the company upon the pledge, through warehouse receipts, of unmanufactured material which had been fraudulently obtained by the company from the vendors, and deposited the proceeds to the credit of the company with his firm, which had no interest in or liability for the deposit other than to pay it out to the company when drawn upon. This deposit was soon drawn out by the company. *Held,* in an action by the vendors of the pledged property to recover the proceeds thereof from the firm, that the president of the manufacturing company, in the whole transaction preceding and including the deposit with his firm, acted as the agent of the company and for his own personal benefit as a stockholder therein, and not as the agent of his firm; and that his knowledge of the fraud, so acquired, was not imputable to his copartner, and did not render the latter liable to the company's vendors.

5. Duty of Inquiry. It was found by the trial court that the copartner of the manufacturing company's president knew of the insolvency of the company. *Held,* that even if this was the fact, it was not suggestive of a presumption of fraud and did not impose such a duty of inquiry upon the copartner as to give his failure to investigate the transaction the effect of imposing upon him the liability of the company to its vendors.

6. Cause of Action not Established. *Held,* also, that the vendors failed to make out a cause of action against the copartner of the manufacturing company's president, regarding the facts as establishing that the moneys sought to be recovered were withdrawn by the company within the exercise of its right to do so, under its arrangement with the firm, without any benefit to the firm and before any notice of the vendors' claim.

*Bienenstok* v. *Ammidown,* 11 Misc. Rep. 76, reversed.

(Argued January 17, 1898; decided February 4, 1898.)

Appeal from a judgment of the General Term of the late Superior Court of the city of New York, entered January 30, 1895, which affirmed a judgment in favor of plaintiffs entered upon a decision of the court on trial at Special Term.

The nature of the action and the facts, so far as material, are stated in the opinion.

*William W. MacFarland* for appellant. The judgment appealed from is erroneous and should be reversed on the authority of *Hatch* v. *Nat. Bank* (147 N. Y. 184). (*Parker* v. *Conner,* 93 N. Y. 118; *Hutchinson* v. *Manhattan Co.,*

150 N. Y. 250; *Stephens* v. *Board of Education,* 79 N. Y. 183; *Southwick* v. *F. Nat. Bank,* 84 N. Y. 421; *Henry* v. *Allen,* 151 N. Y. 1; Pom. Eq. Juris. 77; *Bickford* v. *Menier,* 107 N. Y. 490; Lindley on Part. 287; *Constant* v. *University of Rochester,* 111 N. Y. 604; *Slattery* v. *Schwannecke,* 118 N. Y. 543; Story on Agency, § 140.)

*A. Blumenstiel* for respondents. There was fraud in the purchase. (*Devoe* v. *Brandt,* 53 N. Y. 462; *Anonymous,* 67 N. Y. 598; *Nichols* v. *Pinner,* 18 N. Y. 295; *Cragie* v. *Hadley,* 99 N. Y. 135; *Whitten* v. *Fitzwater,* 129 N. Y. 626.) If it is considered as established that the goods in question were fraudulently obtained from the plaintiffs, then it follows that the property so received could be reclaimed not only from the wrongdoer but also as well from the transferee thereof, except the latter stood in the position of being a *bona fide* purchaser for value and without notice. (*Porter* v. *Parks,* 49 N. Y. 566; *Stevens* v. *Brennan,* 79 N. Y. 254; *Dows* v. *Kidder,* 84 N. Y. 121; *Meecham* v. *Colligreen,* 7 Daly, 402; *Mather* v. *Freelove,* 3 N. Y. S. R. 424; *A. S. R. Co.* v. *Fancher,* 145 N. Y. 552; 1 Lindley on Part. 152, 298; Pars. on Part. 150; 17 Am. & Eng. Ency. of Law, 1065; *Bradner* v. *Strang,* 89 N. Y. 299; *Bridges* v. *Banfield,* 12 Sim. 369.) Such being the law with respect to the property itself, the same rule is applicable to the proceeds thereof. (*A. S. R. Co.* v. *Fancher,* 145 N. Y. 552; *Converse* v. *Sickles,* 146 N. Y. 200; Perry on Trusts, § 166; *Matter of Cavin* v. *Gleason,* 105 N. Y. 256; *Ferris* v. *Van Vechten,* 73 N. Y. 118.) Where the property changes its form and is converted into money, such proceeds can be followed just the same as the goods could have been — provided the proceeds can be traced. (*Dows* v. *Kidder,* 84 N. Y. 121; *Van Alen* v. *A. Nat. Bank,* 52 N. Y. 1; *Holmes* v. *Gilman,* 30 Abb. [N. C.] 212; 138 N. Y. 369; *Stephens* v. *Bd. of Education,* 79 N. Y. 183; *Southwick* v. *F. Nat. Bank,* 84 N. Y. 435; *Newhall* v. *Wyatt,* 139 N. Y. 452; *Pierson* v. *McCurdy,* 33 Hun, 520; 100 N. Y. 608; *Wetmore* v. *Porter,* 92 N. Y. 77;

*P. A. Co.* v. *S. & L. Bank*, 23 Abb. [N. C.] 172.) This was
a transaction within the ordinary course of the business of
Ammidown & ·Smith in its dealings with the Rittenhouse Com-
pany, and the firm of Ammidown & Smith was chargeable
with the actual knowledge, which the court says Ammidown
had, of the fraud surrounding the purchase of the goods,
no matter how Ammidown acquired such knowledge. (17
Am. & Eng. Ency. of Law, 987; 1 Lindley on Part. 127,
141; *S. F. Soc.* v. *Savings Bank*, 78 Am. Dec. 390; *W. S.
Co.* v. *Walker*, 65 Am. Dec. 759; Pars. on Part. 150.) It
is, however, claimed by the defendants that the notice must
be acquired in the· carrying out of the partnership transaction
itself, and that knowledge, although in fact possessed by the
agent, is not to be imputed to the principal or to the partner,
if obtained outside of the particular transaction. This is
untenable. (*Constant* v. *University of Rochester*, 111 N. Y.
604; *Cragie* v. *Hadley*, 99 N. Y. 131; *Holden* v. *N. Y. &
E. Bank*, 72 N. Y. 286; *Slattery* v. *Schwannecke*, 118 N.
Y. 543, 547, 548; *Wiener* v. *M. Ins. Co.*, 1 Am. Rep. 659;
*Atlantic Mills* v. *I. O. Mills*, 9 Am. Rep. 698; Story on
Agency, § 140.) The question of having parted with value is
no defense, if there was notice. (*Billings* v. *Russell*, 101 N.
Y. 226; *Grossman* v. *Walters*, 33 N. Y. S. R. 921; 44 N.
Y. S. R. 933; *Eckhard* v. *Epstein*, 33 N. Y. S. R. 806;
*Bailey* v. *Claflin*, 36 N. Y. S. R. 82; *Stevens* v. *Brennan*,
79 N. Y. 254; *Comstock* v. *Hier*, 73 N. Y. 273; *Weaver* v.
*Barden*, 49 N. Y. 286; 1 Benj. on Sales, 570.)

GRAY, J. The plaintiffs seek by their action to recover
from the defendants, a firm of commission merchants in the
city of New York, a sum of money which represents the pro-
ceeds of property alleged to have been wrongfully obtained
from the plaintiffs, in a transaction had between them and a
corporation called the Rittenhouse Manufacturing Company,
and which, as they allege, came into the hands of the defend-
ants with knowledge of the circumstances. They recovered a
judgment in the Superior Court of the city of New York;

which was affirmed, upon appeal, by the General Term of that court, and now the defendant Smith has further appealed to this court, claiming that the judgment should be reversed upon the general ground that, assuming the transaction whereby the Rittenhouse Manufacturing Company obtained the plaintiffs' property to have been fraudulent as to them, nevertheless, the defendant firm is not liable to respond to them for the proceeds upon any theory of actual or constructive knowledge, or upon any theory connecting the partnership with the transaction complained of.

The facts, as established by the evidence upon the trial, are that the plaintiffs, who were wool merchants, of St. Louis, Mo., sold, in September, 1890, a number of sacks of wool to the Rittenhouse Manufacturing Company, a corporation existing under the laws of New Jersey and engaged in the business of manufacturing woolen goods. The purchase was made by Gardner, the general managing agent of the company, and while the wool was in transit, Ammidown, the president of the company, directed it to be stored in the city of New York and warehouse receipts were issued therefor. With these warehouse receipts as collateral security to a note of the company, a loan was obtained from the Bank of America, of the city of New York, of $9,242.44, representing the face of the note less the discount. At the time of the purchase the company was, and had been for a long time, insolvent; its indebtedness being very largely in excess of its assets. The wool purchased from the plaintiffs was pledged in order to relieve the financial needs of the company and it was done by the direction of Ammidown, its president. He was the senior member of the defendant firm; which was composed of himself and of the other defendant, Albert D. Smith, and which, always and for a number of years, had been acting as the consignee of the manufactures of the company. Smith had no interest in the company; but Ammidown was its largest stockholder, owning about ninety per cent of the capital stock, and he had, in the commencement of the business relations between the company and his firm, individually, guaranteed the latter against loss

from the account. By the arrangement existing between the company and the firm, the latter was to advance to the company seventy-five per cent upon the invoice value of goods consigned. The account becoming very largely overdrawn, at a time prior to the transactions in question, the defendant Smith had insisted that the advances must be restricted and the account kept down; whereupon it was agreed between the firm and the company that a book, called an " advance book," should be opened, separate from the general books of account of the firm, in which should be entered from time to time such sums as the company was at liberty to draw out, as against consignments or deposits. That " advance book " was always to be open to inspection on the part of the company and it was not to draw for any sum except as therein shown to be subject to its drafts. The company, for its own convenience, was, during the whole course of the account, in the habit of depositing with the firm sums of money derived from various sources, independent of and unconnected with the ordinary course of its business with the firm as its consignee and factor; but in such deposits the firm had no interest. The accommodation in that respect was similar to that which was extended to other customers of the firm. Such deposits were at all times subject to the draft of the company and after the " advance book" was opened, they were entered therein as subject to the draft of the company and were generally drawn out almost immediately. Under the arrangement, therefore, as established between the company and the firm, the company could draw, by way of advances on the part of the firm, seventy-five per cent of the invoice value of goods consigned and the full amount of any moneys deposited from sources not connected with consignments and the so-called " advance book " exhibited at all times the amount which the company was entitled to draw, under the one or the other head of credits. It was contemplated that future advances should be restricted and that the margin in the value of the goods consigned, as realized upon sales made, should be applied, after deducting commissions and

interest, to the reduction of the previous indebtedness of the company, which had been incurred through the overdrafts referred to. The check, representing the loan by the Bank of America upon the pledged wool, was drawn to the order of the Rittenhouse Manufacturing Company and, after being received by Ammidown, the president of the company, was deposited by him with his firm and the amount thereof was credited to the company upon the "advance book." The defendant Smith had no personal knowledge of the transactions between the company and the plaintiffs, nor of the origin of this check. In the month of December following, the company went into the hands of a receiver and the defendant Ammidown being individually involved in its failure, as an indorser upon its business paper and otherwise, made an insolvent assignment. Upon his becoming involved he retired from the firm, largely indebted to his copartner, the defendant Smith.

The facts which have been above stated were found by the trial judge and, substantially, narrate the history of events in this record.

The theory of the trial judge, in reaching a conclusion favorable to the claim of the plaintiffs, and the affirmance of the judgment was upon his opinion, was that, while Smith had no personal knowledge upon the subject, nevertheless, the circumstances were such as to put him upon inquiry concerning the character of the transaction between the manufacturing company and the plaintiffs and failing to make such inquiry, that he was chargeable with knowledge that the wool, or the proceeds deposited with the firm, by reason of the fraud practiced, still belonged to the plaintiffs. He took the view that the knowledge of his partner, Ammidown, concerning the transaction, should be imputed to Smith, or to the firm itself, and thus it had received the proceeds impressed with Ammidown's knowledge as to their source, even though he did not acquire that knowledge in the course of his agency as a member of the firm. He conceded that the knowledge acquired by Ammidown, while acting as president of the

company, did not necessarily charge Smith, his copart-ner, who was a stranger to the company and not bound to know the facts connected with its business, and that no inference was permissible that Ammidown communicated the facts to his partner; but he held that the relations which the firm sustained to the company were such as to make Smith chargeable with the knowledge of his partner, even to the extent of the history of the check which was deposited with the firm. He, also, conceded force to the circumstance that the proceeds were turned over to the company before any notice was had of the plaintiffs' claim and that the firm derived no benefit from the proceeds; but he deemed that that circumstance was overborne by an actual knowledge on the part of Smith of the insolvency of the Rittenhouse Company and by the imputed knowledge of the source of the proceeds. So, among his findings of fact are those to the effect that Smith knew that the company was insolvent; that the receipt of the check by the firm was a partnership transaction with the company; that the defendants knew that it proceeded from the fraudulent transaction between the company and the plaintiffs and that the knowledge which Ammidown had concerning the fraudulent purpose was present in his mind at the time of the receipt of the deposit by his firm of the Bank of America check.

The case is relieved of any difficulty which might be offered to our review of it, in some conflict in the evidence. The facts, so far as they are important in their bearing upon the question of the defendants' liability, are undisputed and leave that question to be solved by an application of the legal principles which underlie and affect the partnership relation. Both counsel are in accord in that respect and they differ in the legal view to be taken of the situation, as exhibited by the proofs. What that situation was, is made, in my judgment, very distinct. The findings, to which attention has been called, show that there was no connection whatever between the defendant firm and the plaintiffs; that in the transaction between the plaintiffs and the manufacturing company, Ammidown was act-

ing, merely, as an officer of the company and, whatever his part in, or knowledge of the same, he was in no manner representing his firm; that the deposit of the Bank of America check with the firm was in accordance with an arrangement by which the firm accommodated that particular customer, in common with its other customers, in receiving deposits subject to draft, but in which it had no interest; that the check was deposited for the benefit of the manufacturing company and to put it in funds to relieve those pressing financial needs, the existence of which was the cause of the wool having been diverted to other than manufacturing purposes. Though the trial judge has found that the receipt of this check by the defendant firm was in the ordinary course of its business with the manufacturing company, that it was a partnership transaction and that it went to the credit of the company, those findings do not, necessarily, in their scope, operate to charge the firm with an unlimited liability to respond for the same consequences which might follow upon a regular and ordinary business transaction, in the conduct of which Ammidown would be acting. as its agent as well as that of the company. The findings make that sufficiently clear when read together; because they show that, aside from its business as the consignee and the factor of the company, the firm acted as a gratuitous depositary of moneys for the company and, in that sense only, had added a branch to its regular business transactions with the company. It may be admitted to have been, in a sense, a partnership transaction to receive such a deposit of moneys; but that circumstance is qualified and materially affected by the fact that it was a mere accommodation extended to the customer, from which the firm could derive no benefit, having no interest in such deposits, and holding the same subject to immediate draft.

It seems clear, as matter of fact, that the proceeds of the Bank of America check were drawn out by the company within three days of their deposit with the firm and the presumptions are all that way from the evidence. It was error for the trial judge to refuse to find, as requested, that the

company, between the 27th and the 29th of September, drew out the sum of money represented by the check and noted in the "advance book," together with other sums of money noted in that book as subject to the company's draft; as it was, also, error to refuse to find, as requested, that the firm had nothing to do with the check other than to receive it from the company, deposit it, credit the amount and note the amount in the "advance book" as subject to the draft of the company.

Starting with the deposit of September 26th, of $9,242.44, there were received, in addition, between that date and September 29th, of invoice values, $8,656.90; seventy-five per cent of which, namely, $6,492.68, was subject to the company's draft. The aggregate sum subject to draft, therefore, was $15,735.12. On the 27th and on the 29th, two checks aggregating $15,000 were paid to the company. As against this evidence that the proceeds of the Bank of America check were drawn out within that time, the plaintiffs contend that, as matter of fact, the indebtedness of the company to the firm appears to have been reduced within that time in an amount exceeding the sum of $11,000. In order to establish that fact, they take into account moneys received by the firm from sales of goods on the 29th, aggregating in amount over $15,000. Their error in this respect seems to be that those moneys proceeded from sales of goods invoiced prior to September 26th and such proceeds were applicable to make good previous advances upon those goods. They should not be taken into account for that period, in ascertaining the amount which the company was entitled to draw and did draw against the credits on the book. This might be a sufficient answer to the contention of the plaintiffs; but a further answer is in the finding of the court that the firm had no interest in such a deposit as was made of the Bank of America check. The finding that that class of deposits was subject to the company's draft and, usually, immediately drawn out, is made applicable to the present case by the evidence of the company's manager; who testified that he did draw out between the 26th

and the 29th the sum of $15,000, a part of which was the amount of the Bank of America check. The testimony of that witness was clear and unimpeached as to the facts testified to and he is to be believed, when he says that he examined the "advance book" to see that the credit of the check had been made there and, finding that it was entered in connection with the other items mentioned, that he drew against the credits by the two checks referred to. The account, when analyzed, quite substantiates his testimony. The check had nothing to do with the general account of the company with the firm and the presumption is altogether one way, and in accord with what I think to be shown by the facts mentioned, that the amount of the check was almost immediately drawn out. The check was not obtained by the company with any idea of reducing its debt to the defendant firm, but to put it in funds at once. It is unnecessary that an inquiry should be extended into all of the ordinary books of account of the firm, in order to elucidate the matter. Doubtless, as shown by the evidence, whatever entries appeared in the "advance book," ultimately, were carried through the ordinary account books. That would be proper bookkeeping; but only a matter of bookkeeping. The essential point to be remembered is that the "advance book" was an independent book, opened to show precisely what moneys the company at all times might have the right to draw out. Whatever, in the orderly and very complete system of bookkeeping which appears to have been pursued by the firm, may be shown with respect to the accounts kept, the purpose and the effect of the "advance book" were nowise affected by the deductions which an accountant might be able to draw from the whole body of accounts.

Aside, however, from this consideration of what seem to have been the facts with respect to the disposition of the proceeds of the Bank of America check, there is a broader view to be taken of the question of the firm's liability and that is that Ammidown was not so far an agent of his firm, as in any part of this transaction, to charge his copartner, by implication and under the doctrine of imputed knowledge. The

principle of agency applies to copartners; but it is only when it can be seen that a partner is, in fact, acting as an agent of his copartners, that he binds them. In Lindley on Partnership, to which authority both counsel have referred, the doctrine of a copartner's liability is explained and is limited to cases where the partner, whose agency is relied upon, is acting on behalf of his firm. It is there said, (p. 289): "Where one member is acting beyond his power, or is conducting a fraud on his partners, or is the person whose duty it is to give his firm notice of what he himself has done, in all such cases notice on his part is not equivalent to notice by them." Of course, in this case it cannot be seriously claimed that the mere deposit by Ammidown of the Bank of America check was the act by him, which would give rise to all the consequences claimed by these plaintiffs; for that might as well have been performed through Gardner, the manager, or through any ordinary messenger. The theory of liability must rest for its support upon the fact of the moneys being received by the firm through the agency of one of its members; in whom was present the knowledge of their fraudulent origin. There is no claim of any misapplication by the firm of the moneys. In this connection, it may be observed that the question has been discussed upon the assumption that the transaction between the company and the plaintiffs was fraudulent. Whether it was so or not was a question upon the facts and I do not regard it now as one of importance to this appellant. If he cannot be brought in, upon the theory of the plaintiffs, as a participant by implication in the matter, it is of no consequence how far the proof went to establish the fraudulent nature of the original transaction.

If, except for the fact that the Bank of America check came to be received by the defendant firm through the act or procurement of Ammidown, it would not have been liable to the claim of the plaintiffs, then it would seem to be clear that Ammidown's membership of the firm is availed of to make of him an agent, whose knowledge of the fraudulent origin of the moneys was imputable to his copartner. That would not

only be a harsh extension of the law of principal and agent;
but it would be quite in conflict with the principle that where
a partner is conducting a fraud upon his copartners, notice on
his part is not equivalent to notice by them. (Lindley on
Partnership, *supra*.) With no other liability as to such a
deposit than to pay it out to the company when drawn upon,
and having no interest in it, Ammidown, according to the
theory of this action, was imposing upon his firm another
kind of liability; namely, one to these plaintiffs. To put
the firm in a position where it would be liable to respond
as in tort to the demand of the plaintiffs, was to do an
act utterly outside of the field of his agency and to com-
mit unconscionable fraud upon it. The law of partner-
ship and the law of principal and agent, which underlies
the partnership relation as to the liabilities of partners,
sanctions no such proposition. I can see nothing in the
case of *Constant* v. *University of Rochester*, (111 N. Y. 604),
which lends support to the plaintiff's case. There the ques-
tion was whether the knowledge, which Deane, who acted as
the attorney and agent of the university, had of the existence
of Constant's prior unrecorded mortgage, at the time when he
took the mortgage for the university, was chargeable to the
latter; so as to subject its mortgage to the lien of the former's
mortgage, in respect of which Deane had also acted as the
mortgagee's attorney and agent. The view, taken by a
majority of the court, was that as the facts failed to show
that the knowledge of the prior unrecorded mortgage was
present in the mind of Deane at the time of his taking the
mortgage for the university, the latter was not chargeable with
notice. The dissenting members of the court thought that
the finding by the trial judge, that Deane had knowledge of
the prior mortgage at the time of the transaction of the uni-
versity loan, was supported in the proof of the circumstances
attending it. In that case, the question was one, purely, of
how far the knowledge which a common agent had, or might
have had, with respect to transactions conducted for his two
principals, was to be imputed to one of them and it was only

because the proof was deemed to fall short of showing that there was a recollection by Deane of the facts which would have affected the university, that the latter was held not to be chargeable with their knowledge. The present case is not parallel; because Ammidown, in depositing with his firm the proceeds of the pledge of the wool was not doing something in the course of his agency as a member of the firm. In that act, he was the agent of the Rittenhouse Company. In no part, which he took in these transactions, was he acting otherwise than as an agent or officer of the company and those transactions only touched the firm when the Bank of America check was deposited with it.

The learned trial judge was obliged to concede, in his reasoning upon the case, that Ammidown's knowledge as to the source of the moneys was not acquired in the course of his agency as a member of the firm and he was compelled to find a basis for his conclusion that, nevertheless, they were received by the firm impressed with Ammidown's knowledge, solely, in the proposition that that knowledge should be imputed to the copartner. But the principle intervenes to destroy the basis of an imputed knowledge, as before observed, that a member of a firm will not be permitted by conduct, amounting to a fraud upon his copartners, to bind them, as in some transaction within the sphere of the partnership. The communication of the facts concerning the transaction will not be presumed in such a case. The fraudulent transaction, of which the plaintiffs complain, was one by which Ammidown expected to benefit; for he had proprietary interests in this company, to the extent of owning about ninety per cent of its capital stock and, in that view of the case, his situation was one so personal in its nature as to remove every support from the proposition that he was at any time acting within the scope of his agency as a member of the firm. Where an agent commits an independent fraud for his own benefit, he ceases to act as an agent for his principal and, as it is essential to the very existence or possibility of the fraud that he should conceal the real facts from the latter, the ordinary presump-

tion of a communication between them fails. To the contrary, the presumption is that no communication was made and, consequently, the principal is not affected with constructive notice. (Pom. Eq. Juris. § 675; *Henry* v. *Allen*, 151 N. Y. 1.) This doctrine is quite applicable to the present case, when we consider that Ammidown, in temporarily depositing the proceeds of property fraudulently acquired by him for his manufacturing company with his firm, without any communication of the fact to his copartner, would be conducting a fraud upon him; if, in so doing, he could make him incur an unsuspected and unusual liability to a third person. The rule of law, which attaches a responsibility to the status of a partnership relation for the acts of a copartner, within the scope of business transactions, is founded upon a just view of the requirements of public commercial interests. To extend its operation to the extent of imputing the notice or knowledge of a copartner, acquired in transactions outside of the partnership business and which were had for his individual benefit, would be to convert the rule into an instrumentality of injustice. The result would be as illogical, in my opinion, as it would be indefensible upon legal grounds.

The trial judge held that Ammidown's copartner, Smith, knew of the insolvency of the manufacturing company and, therefore, was so far put upon inquiry as to make him chargeable with every knowledge which inquiry would have disclosed. The holding was rather extraordinary; because there is nothing in the evidence to show that he had any such actual knowledge and it was expressly denied by him and, also, because, if the circumstance of the large indebtedness of the company to the firm was something which might have given rise to a suspicion of financial embarrassment. it was not suggestive of a presumption of fraud. (*Hatch* v. *National Bank*, 147 N. Y. 184.) However it may have been to Smith's own interest to investigate the affairs of the company, in order to ascertain its solvency, it was not so much his duty, as that the failure to perform it can result in saddling upon him this liability of the company to third parties.

Upon the facts of this case, whether we regard them as establishing that the moneys sought to be recovered by the plaintiffs were withdrawn by the manufacturing company, within the exercise of their right to do so, without any benefit to the firm and before any notice of the plaintiffs' claim; or whether we regard Ammidown's acts in connection with the transaction as not coming within that principle of the law of agency, which imputes to one copartner the notice or knowledge possessed by the other copartner, I think the only conclusion to be reached is that the plaintiffs failed to make out a case entitling them to a recovery and that, therefore, the judgment appealed from should be reversed and a new trial ordered, with costs to abide the event.

All concur.

Judgment reversed. _____