(27 App. Div. 146.)

RANDALL et al. v. KNEVALS.

(Supreme Court, Appellate Division, First Department.   March 25, 1898.)

1. EVIDENCE—DECLARATIONS OF PARTNER.
     Where one member of a co-partnership, who has in his possession negotia-ble bonds owned by a third person, wrongfully delivers them to his firm as collateral security for personal loans from the firm, so as to make them part and parcel of the firm assets, his declaration as to the facts, made to the owner's agent, is admissible in evidence against the co-partnership, or their assignee under a general assignment for creditors, in an action by the owner to recover the bonds.

2. SAME—ADMISSIBILITY.
     The admissibility of such declarations does not depend upon the attitude and situation of the individual partner when the declarations are made.

3. SAME.
     Nor are they rendered inadmissible by the fact that they are made by the wrongdoer himself, and point incidentally to his individual guilt.

4. PARTNERSHIP—BAD FAITH OF MEMBER—BURDEN OF PROOF.
     Even if, in such a case, the bad faith of the individual member is not con-clusively imputable to the firm as matter of law, it at least throws upon the firm the burden of showing good faith and the absence of notice as a matter of fact.

Appeal from judgment on report of referee.  °

Action by Gertrude M. Randall and others against Sherman W. Knevals, as assignee of Caldwell & Bunker, impleaded with others. Judgment for plaintiff, and defendant Knevals appeals.  Affirmed.

The plaintiffs in this action seek, in effect, to recover 14 bonds, for $1,000 each, in the possession of the Bank of America. The bank held these bonds as security for certain notes of the firm of Caldwell & Bunker. No claim is made against the bank. Its right to the bonds as pledgee in good faith is not questioned. The bank, however, held other securities for the notes in question, and the plaintiffs' claim is that these other securities should be first applied to the payment of these notes, and that thereupon the 14 bonds, or what is left of them after such payment, be delivered to their trustee. In other words, the plaintiffs claim these 14 bonds, as against Caldwell & Bunker and the defendant Knevals, as assignee of that firm. The complaint alleges that the bonds in question were part of the estate of one Mary H. Holley, who married William R. Bunker, one of the members of the firm of Caldwell & Bunker. Mrs. Bunker died in August, 1891, leaving a will, by which she left her residuary estate to her husband, William R. Bunker, in trust for her two daughters for life, with remainders to her children. The plaintiffs are her daughters and their children. William R. Bunker was the executor and trustee under his wife's will, and letters testamentary were issued to him. The action is brought by the beneficiaries under Mrs. Bunker's will, because the trustee, Bunker, neglected and refused to take steps for the recovery of the bonds, and because the misappropriation which is the basis of this action was his act. The assignee of Caldwell & Bunker defended, denying the plaintiffs' title, and claiming that the firm was a bona fide holder of the bonds for value, and that he, as assignee, had succeeded to its rights. The issue on this head was referred to a referee, who reported in favor of the plaintiffs, holding, in substance, that, as the firm of Caldwell & Bunker received the bonds from one of its members, the fraudulent acts of that member were imputable to it, and that consequently the firm did not take the bonds in good faith. From a judgment rendered upon the referee's report the assignee appeals. Other facts are stated in the opinion.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, O'BRIEN, and INGRAHAM, JJ.

Walter S. Logan, for appellant.

Phillip C. Bartlett, for respondents.

BARRETT, J. Two questions are presented by this appeal: (1) Whether the declaration of William R. Bunker, made to the plaintiffs' agent, Randall, in the month of February, 1894, was admissible as against the assignee; (2) if it was, whether Caldwell & Bunker were holders of the bonds in good faith.

The declaration was in writing, and was signed by Bunker upon the 23d day of February, 1894. It is quite an elaborate statement, giving a history of the conversions and misappropriations which ultimately resulted in the possession of the bonds by his firm. The part of it which is material in this action is a statement, in substance, that these bonds were pledged by him to Caldwell & Bunker, at various times during the existence of the firm, as collateral security for loans to himself individually; that they belonged to Mrs. Holley, or Mrs. Bunker, or her estate; and that his use of them in the manner indicated was without her knowledge, authority, or assent. The firm failed, and made a general assignment to the defendant Knevals, in November, 1894. It was in existence and conducting its ordinary

business in February, 1894, when the admission was made. The circumstances attending the admission were that Mr. Randall, who was acting for the beneficiaries under Mrs. Bunker's will, conferred with Bunker at his residence on the 22d day of February, 1894, with respect to the securities in his possession as executor of the estate. But a few words passed between them. Bunker asked whether he could see the adult beneficiaries, and Randall said, "No;" that he and one Brooks represented them. The next day Bunker called at Randall's office, and delivered to the latter a paper, authorizing Brooks and Randall to take possession of the securities belonging to Mrs. Bunker's estate. Three days later Bunker handed to Randall the admission. When this admission was made, and when the conversation between Randall and Bunker, which followed, took place, the bonds were in the possession of the firm of Caldwell & Bunker. This fact was proved by competent evidence, apart from Bunker's admission. In fact, the assignee, in his answer, admits that in October, 1894, the firm of Caldwell & Bunker was in possession of the bonds, as alleged in the complaint. He also admits that the firm had obtained loans from the Bank of America upon these securities. The transactions between the firm of Caldwell & Bunker and the Bank of America were proved by the assistant cashier and the loan clerk of the bank. It was also proved, by entries in the books of the firm, that Caldwell & Bunker received the bonds from William R. Bunker, and that they held them as collateral security for loans made to him. Part of Bunker's individual loan account was put in evidence, and showed the transaction between him and the firm. It thus appeared, by evidence aliunde the admission, that Bunker delivered these bonds to his firm as collateral security for an individual loan, and that the firm thereafter treated the securities as its general assets, and used them for its business purposes in the same manner as it used its other property.

Upon this state of facts, we think it quite clear that Bunker's declaration with respect to the true ownership of the bonds was admissible. It was a declaration made by one member of a partnership, during its continuance, with regard to partnership affairs and property. It is well settled that such a declaration is evidence as against the firm. It is, in legal effect, a firm declaration. Fogerty v. Jordan, 2 Rob. (N. Y.) 319; Klock v. Beekman, 18 Hun, 502; Gay v. Bowen, 8 Metc. (Mass.) 100; Lindhjen v. Mueller, 42 Minn. 307, 44 N. W. 203; Lucas v. De la Cour, 1 Maule & S. 249; Cunningham v. Sublette, 4 Mo. 224; Bank v. Beckman, 36 N. J. Eq. 83; Doremus v. McCormick, 7 Gill, 49; Munson v. Wickwire, 21 Conn. 513. It was not a declaration relating to concerns foreign to the partnership, nor with regard to a matter outside of the scope of the partnership business, as in Heffron v. Hanaford, 40 Mich. 305; nor was it with regard to a transaction on its face individual, as in Thorn v. Smith, 21 Wend. 365, and Uhler v. Browning, 28 N. J. Law, 79.

We agree with the appellant that the declaration, to be admissible, must have relation to the joint business or the joint property. Here, however, the bonds were in the possession of the firm. Its possession

was the possession of each of its members. So, too, were the apparent ownership and title. The declaration related to the joint possession and the joint ownership. In Lucas v. De La Cour, supra, where partners sued for the loss of property, the statement of one of them that he was the owner, and not the firm, was admitted to defeat the action. The rule was applied in the same manner in Lindhjen v. Mueller, supra. There the court said that statements, made by one of the members of the firm, that an account which they were seeking to recover was his individual property, and consequently not firm property, "were properly received in evidence as declarations and admissions, made against interest, by a member of the firm which was attempting in the proceeding to recover an account alleged to be due to the partnership." So, too, a statement by a partner, that he had received from a debtor the money claimed by his firm as due, was held admissible against the other partner. Munson v. Wickwire, 21 Conn. 513. In Odiorne v. Maxcy, 15 Mass. 39, Chief Justice Parker observed that "the confession of one member of the co-partnership of any fact tending to bind the whole in a matter of joint concern is unquestionably good evidence against the whole." The text writers sum the rule up in substantially the same language. Story, Partn. 107; Whart. Ev. §§ 1192, 1194; Colly. Partn. (Wood's Ed.) § 775; Phil. Ev. (4th Am. Ed.) 496; Jones, Ev. § 249. "The admissions of one partner," says Mr. Jones, "have been held admissible against all to prove ownership of goods in possession of the firm." This is the logical sequence from the fact of the joint possession and the rights which flow therefrom. As Chief Justice Shaw said, in Bridge v. Gray, 14 Pick. 55, "each has a right to the partnership goods and effects, and to the application of them to any purpose of the partnership."

The appellant advances the somewhat singular notion that the admissibility of such declarations depends upon the attitude and situation of the individual partner when the declarations are made. But surely a statement which would have been admissible, if made by Bunker in Caldwell & Bunker's office, in answer there to a direct inquiry as to the partnership rights with regard to the bonds, is equally admissible, though the declaration fell from his lips or pen when he was addressed as a trustee in his private residence. As Lord Ellenborough said, in Jacoud v. French, 12 East, 317, "it is impossible to sever the individuality of the person." The admissibility of what the man Bunker said or wrote depended solely upon its relation to the partnership affairs or property,—not in the least to the particular incident which called out the statement. The admission was, in effect, that the 14 bonds in question, then in the custody and control of the firm of Caldwell & Bunker, and of each of its members, under claim of ownership, were in truth and in fact the property of others, and not the property of the firm. Any such statement, no matter how made, during the continuance of the firm, by either Bunker or Caldwell, was clearly admissible as against the firm.

Another peculiar suggestion is that the declaration was inadmissible because it incidentally pointed to Bunker's individual guilt. It is the firm's knowledge of the real ownership of property, imputable to it

because of the knowledge of one of its members, which concludes it on the question of good faith. Whether notice of the real ownership thus comes to it from external sources, or from the individual member's personal knowledge, derived from his own acts, the firm's imputed knowledge is precisely the same, both in fact and in law. A single illustration will make this clear: Suppose the firm of Caldwell & Bunker had loaned money to A. upon the security of these bonds, and A. had informed the individual member of the firm with whom he negotiated the loan that the bonds were not his, but were held by him as trustee of the estate of B.; would not the declaration of that member of the firm to whom A. communicated these facts have been admissible, in an action against the firm by the estate of B. to recover the bonds? It is not doubted that it would. And yet it is suggested that the declaration is here inadmissible because Bunker had the guilty knowledge in his own breast. How that guilty knowledge reached him is surely immaterial. He had it; and that suffices to make his declaration as to the true ownership of the property admissible. Such a declaration, too, is against interest. This is denied, upon the somewhat subtle refinement that it may have been more to Bunker's interest to help the estate to secure the bonds than to have his firm retain them. That is a consideration, however, which relates to the probative value of the declaration,—not to its admissibility. The law cannot speculate as to the possibilities of such an indirect counter interest. If it did, the fact that the declaration was an admission of actual crime would certainly outweigh any consideration of possible pecuniary advantage to the estate. Bunker would hardly admit away his firm property, and in doing so probably confess himself into a criminal jail, merely to aid the trust estate in securing the restoration of property which he had misappropriated. We think the ruling of the learned referee upon the point under consideration was correct, as was also his ruling with regard to Bunker's declaration, to the same effect, on oath in the surrogate's court. The governing principle is the same, whenever or wherever the admission is made. It is still an admission, made during the continuance of the partnership, by a member of the firm, with regard to the firm property and affairs.

It follows, the trust ownership of the bonds being thus proved, that Caldwell & Bunker were not purchasers thereof in good faith and for value. To some extent, it is true, they parted with value, although some of the bonds were taken as security for an antecedent debt. They took none of them, however, in good faith. Bunker's guilty knowledge was clearly imputable to the firm. He turned these bonds over to the firm, knowing that they were the property of Mrs. Holley, or Mrs. Bunker, or her estate. The statement that he obtained an individual loan from his firm thereon is, perhaps, the business way of looking at the transaction; but it is lacking in precision. What he actually did was to draw from the firm's bank account, for his own use, firm money,—that is, money which he owned jointly with his co-partners,—and to substitute therefor securities which he knew belonged to others. It has always been permitted to the real owners, under such circumstances, to trace and identify their securities and recover them.

A distinction has been made in the cases on this head between securities and money. Money cannot well be earmarked. Commercial convenience and business policy require that it shall pass freely from hand to hand, without danger of reclamation. As it cannot be identified or specifically traced in specie, the courts have assumed that it can only be recovered upon the theory of a debt; and it has been held that it cannot be recovered upon that theory. It can only be recovered, under these authorities, when the other partner has had actual knowledge of its source. Jaques v. Marquand, 6 Cow. 497; Willett v. Stringer, 17 Abb. Prac. 153. But the rule as to specific securities has always been the other way. There the notice is constructively imputed to the firm, and the true owner is permitted to identify, trace, and recover his property. Weetjen v. Railroad Co., 4 Hun, 529; Railroad Co. v. Mowry, 28 Hun, 79; Ruckman v. Decker, 23 N. J. Eq. 283; Tucker v. Bradley, 33 Vt. 324; Cunningham v. Woodbridge, 76 Ga. 302. And see Quinn v. Fuller, 7 Cush. 224; McClurkan v. Byers, 74 Pa. St. 405; Stockdale v. Keyes, 79 Pa. St. 251.

In the Weetjen Case the action was to restrain the diversion of certain iron rails by the trustee of a railroad mortgage. The rails had been purchased by the firm of which the trustee was a member to secure advances made thereon to the railroad. It was held that the knowledge of the trustee was the knowledge of this firm, and that the latter could not claim to hold the iron as a bona fide purchaser without notice. Daniels, J., said:

"The fact that he [the trustee] did not directly participate in the active management of the business of these firms can make no difference in this case. He was one of the partners, and for that reason actual notice to him was constructive notice to his associates. It was his duty to communicate what he knew on these subjects to them, and, if he did not, they, and not innocent third parties, must sustain the consequences resulting from the want of it."

For which proposition the learned judge cited Lindl. Partn. (3d Ed.) 304, 305.

In the Mowry Case, one Keys was a member of two firms. As member of one of these firms he purchased certain bonds, which were void in his hands and in the hands of that particular firm. Subsequently that firm sent the bonds to Keys' other firm as collateral security for the payment of a debt. It was held that, as Keys had actual knowledge of the defective title of the one firm, his partners in the other firm were charged with constructive knowledge thereof, and acquired no better title to the bonds than their pledgor had. The cases cited in support of this doctrine by Brady, J. (Jacoud v. French, 12 East, 317; In re Worcester C. E. Co., 3 De Gex, M. & G. 180; and Steele v. Stuart, L. R. 2 Eq. 84), seem to be directly in point.

In Tucker v. Bradley, supra, it appears that one partner, who was a trustee for a married woman, for the purpose of the management of a fund to be kept free from the husband's control, loaned the trust money to his firm, and payments were made by the firm to the husband, without the wife's authority. It was held that the knowledge of the trustee of the husband's disability to control the property was the knowledge of the firm.

In Ruckman v. Decker, supra, one Wilson sold certain property to the defendants, with whom he was a partner. Wilson had misappropriated the property, and the defendants, the Deckers, contended that they did not know of the misappropriation, and that they had paid Wilson for the property in good faith. The court said:

"The three defendants in this case were partners, and are sued as such. They were partners at the alleged time of the taking of these oysters. The doctrine of partnership applies to them, and by that doctrine notice to one partner is notice to all; and if Wilson knew, at the time, that these oysters were in part the complainant's, his knowledge was that of the firm. He may have defrauded his partners. It is probable that he did. Yet the severe but necessary law of partnership makes them liable for his acts and knowledge."

In Cunningham v. Woodbridge, supra, a partner who had misappropriated certain negotiable bonds carried them into the firm as its assets, and the bonds were used by the firm as collateral security in the bank from which they were borrowing. The court said that the question was, did the knowledge of the misappropriating partner bind the firm of which he was a partner, "and was the firm a bona fide holder of this negotiable bond without notice, and its title good against the true owner? If the bond had not been negotiable, but a mere personal chattel, it is clear that the conversion of it by the firm, and their liability for it, would be made out completely. * * * Being a negotiable bond, if they bought it without notice, they would be protected against the true owner. But did the firm buy without notice or knowledge when one of them knew all about it, and fraudulently, as to the true owner, put it into the business of the firm, and they used it as collateral? Notice to one partner is notice to all, and binds the firm. Knowledge of one is knowledge of all, and binds all. Therefore, the firm procured this bond with full knowledge to whom it belonged, and the plaintiff is entitled to recover it." This is certainly a just principle, and we have not been referred to any authority in which it has been deviated from. Indeed, the authorities, so far as our research goes, are all one way upon the question.

The appellant relies mainly upon the case of Bienenstok v. Ammidown (lately decided by the court of appeals) 49 N. E. 321. We find nothing in this case, however, which conflicts with the general rule upon this head. In that case Ammidown committed no fraud upon the plaintiffs as a member of the firm of Ammidown & Co. The plaintiffs were defrauded of their goods by a corporation of which Ammidown was the president. Ammidown knew that this corporation had committed the fraud, but that knowledge was his as president of the company,—not as member of the firm. The goods were not brought into the firm, nor did the firm exercise any acts of ownership with regard thereto. They did not become the joint property of the two partners by the fraudulent acts of one. It is just there that that case differs essentially from the present. Ammidown, as president of the corporation, obtained a loan upon the goods from a bank, and the check which represented the loan was drawn to the order of the corporation. The only connection of the firm with the entire transaction was the indorsement of that check by Ammidown as the president of the

corporation, and its temporary deposit in the firm's bank account for the convenience—substantially to the use—of the corporation. This deposit was not in any way or manner for the benefit of the firm. It had no interest therein, nor did it use the nominal credit thus obtained, directly or indirectly, for its own purposes. The deposit was solely for the convenience of the corporation under an arrangement between it and the firm. By that arrangement, the deposit was subject to the immediate draft of the corporation, and the whole amount thereof was turned over to the corporation before the firm had any notice of the plaintiffs' claim. The firm was simply a gratuitous depositary for the company. It had, in substance, no partnership connection with either the goods or their proceeds. What the court held was that under such circumstances the firm was not liable because of Ammidown's knowledge (when the gratuitous deposit was made) that the corporation had purchased the goods fraudulently. The substance of this decision is that the transaction was not within the sphere of the partnership, was not essentially a partnership transaction at all, and consequently that the principle of imputed knowledge did not apply. If Ammidown had taken the goods, and turned them over to his firm as a substitute for firm moneys contemporaneously withdrawn by him for his individual use, and the firm had thereupon treated the property as its own, and for its own benefit had exercised acts of ownership over it, we apprehend that the result would have been different. The goods in that case would have become part and parcel of the partnership assets, and the firm as a unit would have taken them with the imputed knowledge of each of the joint owners.

There are other points of a subsidiary character which are pressed upon us in support of the referee's conclusion, but in the view which we have taken of the case they need not be specially considered. Suffice it to say that, in our judgment, the burden was upon the assignee, as it would have been upon the firm of Caldwell & Bunker, to show something more than the mere withdrawal of moneys from the firm by Bunker upon the turning in of the bonds. This probably tended to show that the firm of Caldwell & Bunker were holders for value, but it did not necessarily show that they were holders in good faith. The burden was upon the firm to show good faith, and that called for proof on its part of the circumstances attendant upon the transaction between Bunker and itself. No such proof was given. The bad faith of Bunker was beyond peradventure. Even if that bad faith was not conclusively imputable to the firm as matter of law, it at least threw upon the firm, or its assignee, the burden of showing good faith and the absence of notice as matter of fact. It also appeared that a part of Bunker's indebtedness to his firm was for losses in speculation, and that the bonds in question were applied to this indebtedness, as well as to the main sum originally withdrawn from the firm. Then, too, at a later period, some of the original securities were withdrawn, and other securities belonging to Mrs. Bunker's estate substituted therefor. Additional securities, belonging to the estate, were added to the collateral to fortify the general indebtedness, as that was increased by the speculative loss. We find, also, that Mrs. Bunker, when she was

Mrs. Holley, had an account in the firm books, showing the ownership of two of these bonds, and that the following entry in red ink was made in that connection: "Transferred to W. R. B. loan account." These are certainly suggestive circumstances. We do not, however, place our judgment upon them as independent facts. Apart from these and all other minor considerations, our conclusion is that the plaintiffs, having traced their specific property into the hands of Caldwell & Bunker,—property which the firm had not received in good faith and for value,—are entitled to have such property restored to their trust estate, as against the firm and against its assignee.

The judgment should be affirmed, with costs. All concur.