(159 App. Div. 497.)

JOHN NEMETH, Inc., v. TRACY et al.

(Supreme Court, Appellate Division, First Department. December 19, 1913.)

1. PARTNERSHIP (§ 146*)—SCOPE OF PARTNERSHIP.

   Where a general copartnership carrying on business as stockholders had accounts in London and Paris and sold stocks there, the drawing of bills of exchange, if necessary to the carrying on of the business, is within the general scope of the partnership business.

   [Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 242–251, 253–255; Dec. Dig. § 146.*]

2. PARTNERSHIP (§ 153*)—LIABILITY OF PARTNERS.

   One partner is chargeable and legally responsible for the fraud of his copartner in the transaction of the partnership affairs within the scope of the partnership business.

   [Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 274–277; Dec. Dig. § 153.*]

3. PARTNERSHIP (§ 153*)—LIABILITY OF COPARTNER—FRAUD.

   Defendant, who was a member of a general stockbrokerage firm, went abroad on account of poor health, leaving another partner in full charge,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

That partner began to draw bills of exchange upon foreign banks and firms without any agreement for their acceptance or obligation to warrant the draft, and by false and fraudulent representation induced plaintiff to purchase. *Held*, that as the partnership carried on large business transactions in foreign countries, and the drawing of bills of exchange might well be necessary, defendant was liable in an action for deceit upon the false representations made in the sale; it appearing that the proceeds were used for the benefit of the partnership.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 274–277; Dec. Dig. § 153.*]

Scott and McLaughlin, JJ., dissenting.

Appeal from Trial Term, New York County.

Action by John Nemeth, Incorporated, against William W. Tracy and others, trading as Tracy & Company. From judgment for plaintiff and an order denying their motion for new trial, defendants appeal. Affirmed.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

Julian C. Harrison, of New York City, for appellants.
A. Delos Kneeland, of New York City, for respondent.

INGRAHAM, P. J. The defendants, by an agreement in writing, dated September 10, 1906, became copartners in a general brokerage business, such as had theretofore been carried on by a prior firm of Tracy & Co., and that copartnership continued down to the time that the firm failed, May 17, 1909. This firm, it seems, for some years had been doing a general brokerage business in the city of New York, dealing in stocks and bonds and other securities, but had not been engaged in what is known as a foreign exchange business, although it appeared that they had accounts with foreign bankers in London and Paris and had bought and sold stocks in London and had been concerned in the sale of some stocks and bonds in Paris. The firm had at one time used the title of bankers and brokers to designate the business which they had carried on, but some time in 1906 the parties agreed that it was unwise to continue to use the name of banker as a part of their business, and it would appear from that time the word "broker" was only used. Some time in February, 1909, the defendant Parker, being in poor health, gave up going to the office to take part in the business of the firm. The last day he was at the office was on the 8th of March, and he sailed for Europe on the 23d of March and remained there until after the failure, and from the time he left for Europe he had no communication with either of his partners, nor had he any information as to the firm business. One of the partners, Mr. Covington, seems to have had charge of the office business of this copartnership. Some day in the latter part of March or the beginning of April, 1909, Covington made inquiries as to the method by which foreign exchange business was transacted in New York, and finally decided to enter into that business and appointed an employé the manager of it. After the 1st of April, the firm procured the necessary stationery and commenced to sell bills drawn on foreign banks. The

defendants had bought and sold stocks heavily through European brokers in London and Paris, but prior to the time of commencing this foreign exchange business they had no account in Vienna.

On May 10, 1909, the firm drew several drafts or checks on banking companies at Vienna, and offered them for sale to the plaintiff, and to induce the plaintiff to purchase these drafts Covington authorized made and made to the plaintiff false and fraudulent representations which were known to be false. Acting upon the false and fraudulent representations, plaintiff purchased the checks on Vienna and paid defendants therefor. There was no money in the bank in Vienna upon which the checks were drawn, nor had defendants assurance that checks would be paid unless they transmitted money to the Vienna Bank, and the checks were not paid when presented. In the meantime the defendants had failed. The money paid for these checks by the plaintiff was received by the firm and was apparently used in the firm business. The complaint alleges the fraud in incurring the obligation, and the sole question is whether this defendant appellant was liable for the fraud of his copartners.

At the end of the plaintiff's case, the defendants moved to dismiss the complaint, upon the ground that no agency had been shown, and nothing had been shown to justify a finding that the defendant Parker was liable, and at the close of the whole testimony that motion was renewed. This motion was denied, the court submitting to the jury: (1) Whether the obligation or liability of the defendants to the plaintiff was induced by fraud; and (2) whether the representations made by Covington and under his directions were made within the scope of the copartnership business conducted by all the defendants in the case, charging the jury that it would not be necessary, in order to hold Parker liable, to show that he had actual knowledge of the commission of the fraud, provided they found that there was a fraud, and that the agent through whom the fraud was perpetrated acted within the scope of his employment, and that the action was within the scope of the partnership business. The defendant then asked the court to charge that the mere fact that the money that was received for the drafts went into the firm account would not justify a verdict against the defendant Parker, which the court charged, stating that the jury must find, in order to find against the defendant Parker: (1) That there was a fraud committed through the agent; and (2) that the transaction was within the scope of the employment and of the partnership. There was no exception to the charge, and the jury found a verdict for the plaintiff against all of the copartners. The question therefore is whether there was any evidence that would justify the jury in finding that this business of selling foreign bills of exchange was within the general scope of the copartnership business, so that the representations of one partner upon which money that was obtained for the firm and used by the firm made the defendant Parker who knew nothing of these special transactions liable for the fraud.

[1] Here was a general copartnership, carrying on a business as stockbrokers in the city of New York. They had accounts in London and Paris and had sold stocks there, and, certainly, if in carrying on such business in London and Paris involving the purchase and sale of .

stock it had become necessary to draw bills of exchange, such act would have been within the general scope of the copartnership business.

Now, this appellant's partner, to obtain money in New York for the use of the firm, started this practice of selling checks or sight drafts on foreign banks, and by false and fraudulent misrepresentations induced the plaintiff to purchase these drafts. This defendant appellant was a general partner. He, apparently, was well acquainted with the nature of the business transacted by his firm prior to the time that he left for Europe. He left New York leaving his partners in charge, without any limitation upon their power to bind him, leaving them to conduct the business in which he was interested. It is conceded that he cannot escape liability for the acts of his partners in issuing these bills of exchange, but his claim here is that he was not responsible for the false representations by which his partners had obtained money for use in the copartnership business. In discussing the liability of the defendant, it must be remembered that the plaintiff was dealing with a reputable firm of brokers of which this defendant appellant was a partner. There is no question as between the partners themselves, but whether the plaintiff, in accepting the representations made by a member of the firm, was justified in assuming that these representations were made by the firm, for its benefit, and were within the general scope of the copartnership business so that the acts and representations of each partner was binding on all the members of the copartnership. The firm, acting as brokers, buying and selling stocks, borrowing · money and issuing its obligations, incurred obligations which on their face made each member of the firm liable, and it is conceded that there would be a civil liability of each member of the firm for these partnership transactions. There is no question of any notice by this appellant as to any limitation of his liability for the firm obligations or statements, or that the plaintiff had any notice that these drafts were not drawn in the ordinary course of business of the firm, or to carry out its legitimate transactions. Nor is it disputed that the obligation or liability of the copartnership was induced by fraud.

[2] I do not think that the decisions which deal with the relations between the public and a firm of solicitors, and the extent to which one member of such firm can bind his partners by representations as to outside transactions, are applicable to a business firm transacting a general business of this kind. The rule is elementary that one partner is chargeable and legally responsible for the fraud perpetrated by his partner in the transaction of the copartnership business and the conduct of the copartnership affairs. Bradner v. Strang, 89 N. Y. 299. Of course, the transaction must be one within the general business for which the copartnership was organized. For one partner for his individual benefit in a transaction in which the copartnership was not involved to attempt to bind the copartnership, with or without misrepresentations, would not render the copartnership liable; and that was the decision in Bienenstok v. Ammidown, 155 N. Y. 47, 49 N. E. 321.

[3] Here, however, the firm, through one of its partners, made false and fraudulent representations to induce the plaintiff to part with its money for the benefit of the firm. The firm received the proceeds of the transaction obtained by the fraud and used them for the benefit of

all copartners, which, I think, makes the general rule applicable that where transactions which are within the apparent general scope of a business conducted by a copartnership take place between third persons dealing in good faith with the copartnership and the copartnership, all of the persons liable for the pecuniary obligations which flow from the transaction are also responsible for any representations made by any member of the copartnership which were used to induce the third party to enter into the relations upon which the liability arose. In this case there was nothing to require the plaintiff to inquire whether this was or was not an ordinary brokerage transaction. The copartnership sold its check or draft upon its foreign correspondents, and for that draft the plaintiff paid its money to the firm, and the proceeds of that draft went into the defendants' business. It is within the general scope of a copartnership of this kind to draw checks and drafts, and a third person, dealing in good faith with the firm, without notice of any limitation of authority, is certainly entitled to enforce his rights aganst the firm, whether based upon contracts, or upon fraudulent misrepresentations by which he was induced to part with his money. I think it clear, therefore, that the defendant was liable for the representations made by his copartner, and that the jury correctly found that the issuing of these checks and drafts was within the scope of the copartnership business.

It follows that the judgment and order appealed from must be affirmed, with costs.

LAUGHLIN and CLARKE, JJ., concur.

SCOTT, J. I am unable to concur in the affirmance of the judgment appealed from. The action is not to recover upon contract, but for damages for a tort, to wit, the fraud and misrepresentation which was used to induce plaintiff to purchase the drafts described in the complaint. That there was such fraud and misrepresentation on the part of one of the members of the firm of Tracy & Co. is not denied, but it is not claimed, nor is there any evidence to show, that the appellant Frederick W. Parker personally committed any fraud or made any misrepresentation by his partner. He is sought to be held in this action solely upon the theory that the fraud and misrepresentation of his copartner is attributable to him by the bare fact of his copartnership relation. He does not question his liability for the indebtedness arising out of the dishonor of the drafts, but that question is not involved in this action. The plaintiff must recover, under its pleading, if it can recover at all, not for the debt, but for the tort. The law of the case as charged by the court and as acquiesced in by both counsel is that the appellant Parker can be held liable for the tort only if it appears that the drawing and sale of foreign bills of exchange was within the scope of the partnership business, and such unquestionably is an accurate statement of the law.

The following facts are clearly established by the evidence and are not disputed: . In the year 1906 the firm of Tracy & Co. was organized; Parker then becoming a member of it. It was organized for the purpose of engaging "in the general brokerage business, such as has

heretofore been done by the firm of Tracy & Co." This prior firm had never engaged in the business of selling exchange, nor did the successor firm until after the month of March, 1909. The business of the firm was the usual stock exchange brokerage business, to which was added, apparently in a small way, what is known as a promoting business. Parker was the Board member of the firm, spending all of his time on the floor of the Stock Exchange. The office business was managed by a partner named Covington, who was the person actually guilty of fraud and misrepresentation. In February, 1909, Parker was taken very ill with diphtheria and was confined to his house for about a month. During this time he was informed that the firm was short of available money and advanced to it about $20,000 or its equivalent in securities, but it does not appear that he was informed or knew that the firm was in failing circumstances. On March 23, 1909, while still very ill, he sailed for Europe, and was quite ill there for some time. He returned to this country in November of the same year. Soon after Parker left, but without his knowledge, Covington began to draw and sell bills of exchange on foreign banks, which he failed to protect or provide for. Among them were the drafts purchased by plaintiff. The firm failed on May 17, 1909. The evidence is convincing and conclusive that the firm had never, until after Parker sailed for Europe, engaged in the business of selling foreign exchange; that that was a business not usually engaged in by stock brokerage houses, who when they have occasion to deal with foreign countries customarily have resort to banking houses making it a part of their business to deal in exchange; and that Parker never knew that his firm had undertaken to draw and sell bills of exchange, until after the failure.

I think that the evidence clearly established the fact that the issue and sale of foreign bills of exchange was wholly outside the scope of the partnership business, and consequently the fraud of one partner in selling the bills to plaintiff was not attributable to Parker, who knew nothing about it, and who had not, in fact or by inference, authorized his partner to engage in that kind of business. The prevailing opinion, as I read it, proceeds upon the theory that because the firm might have had occasion, in the transaction of its usual business, to draw foreign bills of exchange, therefore the plaintiff was entitled to believe, upon Covington's representation, that the bills which it purchased had been drawn and were offered for sale in the regular course of business. That, however, as I conceive, is not the question upon which Parker's liability in this action depends. The right of one partner to bind another depends upon the principle of agency, each partner acting as the agent of all. If Parker is to be held liable for Covington's tort, it can only be upon the ground that the transaction in the course of which the tort was committed was within Covington's implied authority to act for Parker. If it was within the usual course of business of the firm, such an authority will be implied; but where, as in the present case, it was wholly without the usual scope, there is no ground for implying an agency. For these reasons I am of opinion that it was the duty of the trial judge to have dismissed the com-

plaint, or, at the least, to have set aside the verdict as against the evidence.

The judgment should therefore be reversed, and a new trial granted, with costs to the appellant to abide the event.

McLAUGHLIN, J., concurs.