## PORTER v. BEHA, Superintendent of Insurance, et al.

(District Court, N. D. New York. May 25, 1925.)

1. Principal and agent ⚖=178(1)—Knowledge of agent chargeable to principal.

A principal is chargeable with the knowledge which the agent acquires while acting within the scope of his authority.

2. Principal and agent ⚖=161(5)—Knowingly retaining benefit of wrongful act makes receiver principal.

Where one receives benefit from the wrongful act of another, and retains it after knowledge of the wrongful act, he will be deemed to have adopted it as his own.

3. Principal and agent ⚖=177(6)—Acceptance of proceeds of stolen bonds, under facts shown held to charge receiver with knowledge and responsibility for theft.

The Niagara Insurance Company, a New York corporation, had been required by defendant state superintendent of insurance, to obtain $40,000 more money or securities at once as a condition of delay for a week in taking possession of its assets for liquidation. One M., who controlled the company and also a national bank of which complainant was later appointed receiver, stole bonds from the bank

and offered to turn over $40,000 of the same to the company. Representatives of defendant superintendent, having reason to suspect that the bonds might have been stolen, required them to be sold and the proceeds turned over, which was done. *Held*, that by acceptance of such proceeds the company ratified the agency of M., to procure the money and was chargeable with his knowledge of the manner in which it was obtained.

**4. Insurance ⊚⇒50—Insolvency; assets pass subject to defective title of corporation.**

Shortly after an insurance company had received the proceeds of stolen bonds under circumstances which charged it with notice and while it still retained the same its assets were by order of court placed in the hands of the state superintendent of insurance for liquidation; but before the order was made, notice was given in open court that the bonds were stolen. *Held*, that the superintendent took no better title to such proceeds than the company had, but took the same chargeable with its knowledge.

**5. Principal and agent ⊚⇒161(5)—Ratification of agency by receiving proceeds of stolen property.**

That the interests of one who stole bonds, and of another to whom he turned over the proceeds, were not identical, where both were served by his act, does not entitle such other to retain the proceeds of the theft and repudiate the agency of the thief.

**6. Insurance ⊚⇒50—Insolvency; liquidator held chargeable with knowledge of defective title to assets.**

A state superintendent of insurance had been advised by various responsible persons that M., who controlled an insurance company, had a very unsavory record, that he had been charged with illegal and dishonest acts, and that, unless care was taken there was danger that he would wreck the company. He also knew that thereafter, at the instance of M., the by-laws were changed so that checks could be drawn on the company's funds without the signature of the president, and that large deposits of funds had been made in a bank, controlled by M., which was of doubtful solvency. *Held*, that when, in order to delay threatened liquidation proceedings, M. offered to turn over to the company $40,000 in negotiable bonds, which he had in fact stolen, it was the duty of the superintendent to inquire as to the title to the bonds, and that when, without such inquiry, he refused to permit the company to accept the bonds, but directed that they be immediately sold and the proceeds paid to the company, his action was such as to negative his good faith and to charge him legally with knowledge of the theft.

**7. Insurance ⊚⇒44—Securities acquired to avoid liquidation not required to be investment securities.**

Where an insurance company was required, by the superintendent of insurance, to obtain more funds as a condition of delay in liquidation proceedings, it was not required that securities obtained for the purpose should be such as the company could legally buy as an investment of its funds in the usual course of business.

**8. Trusts ⊚⇒357(1)—Receiver of proceeds of stolen bonds held trustee for owner of bonds.**

Where an insurance company, on demand of the superintendent of insurance to raise a certain sum to avoid immediate liquidation proceedings, obtained the money from the man who controlled it, which was the proceeds of bonds stolen by him and sold by direction of the superintendent, a subsequent resolution also passed at the instance of the superintendent, authorizing delivery in payment for the money of a certificate of deposit and check on a bank, which was in fact believed by the parties to be insolvent, was merely a device to give the transaction a legitimate appearance, and did not make the company a good-faith purchaser, so as to deprive the owner of the bonds of the right to follow and claim their proceeds, as held in trust for its benefit.

**9. Trusts ⊚⇒357(1)—Contract held not to confer ownership of fund held in trust.**

A superintendent of insurance, on taking possession of the assets of an insurance company for liquidation, made a contract of reinsurance with another company, by which the latter was to receive all the assets of the insolvent company "except an amount thereof sufficient to liquidate the business of said company." Among such assets received by the superintendent was a sum of money which was the proceeds of stolen bonds, and held by the insolvent company and the superintendent in trust for the true owner of the bonds, and subject in the hands of both to its lien. The reinsuring company had notice of such claim before the time fixed for turning over the assets and probably before signing the contract, but made and carried out the contract, notwithstanding, leaving the sum in dispute in the hands of the superintendent to await the outcome of litigation. *Held*, that it was not a purchaser of such fund in good faith without notice, and had no superior equity as against the true owner.

**10. Judgment ⊚⇒243—Official held chargeable only with interest received.**

In a suit in a federal court against a state superintendent of insurance, to recover a fund in his possession officially, and in which the superintendent as an individual defendant was stricken out, the jurisdiction of the court is limited to the res, and it has no power to charge the defendant with interest beyond what he actually received.

In Equity. Suit by James M. Porter, receiver of the First National Bank of Warren, Mass., against James A. Beha, Superintendent of Insurance, and others. Decree for complainant.

Locke, Babcock, Spratt & Hollister, of Buffalo, N. Y. (Evan Hollister, of Buffalo, N. Y., of counsel), for the plaintiff.

Carl Sherman, Atty. Gen., of New York, Michael J. Montesano, William J. Cahill, and Clarence C. Fowler, Deputy Attys. Gen.

(Arthur E. Sutherland, of Rochester, N. Y., of counsel), for defendant Superintendent of Insurance.

Martin T. Nachtmann, of Albany, N. Y., for defendant Metropolitan Life Ins. Co.

COOPER, District Judge. This suit is brought by the plaintiff as receiver of the First National Bank of Warren, Mass., to impress a trust in favor of the bank upon funds amounting to $39,130.08 in possession of the defendant superintendent of insurance. The money arises from the sale of securities stolen February 6, 1923, from the Massachusetts Bank by one Joseph B. Marsino, who controlled that bank, and sold February 7, 1923, at Buffalo, N. Y., and the proceeds of the sale on the same day paid directly to the Niagara Life Insurance Company of Buffalo, which Marsino, together with his father-in-law, one Abraham Goldman, also controlled through the control of the Bison Holding Company, which held the majority of the stock of the Niagara Company. The present superintendent of insurance was substituted as a party defendant in place of the former superintendent, who was acting as such during all of the occurrences out of which this suit arises. The present receiver of the Warren bank was also substituted as party plaintiff in place of the receiver first appointed February 23, 1923, but who resigned after the commencement of this action. All references herein are to the former superintendent of insurance, who will be called the defendant superintendent, and to the former receiver, who will be called plaintiff receiver.

### Facts.

The evidence in this case is somewhat lengthy and involved, and only the salient facts will be stated at this time.

Marsino, some time in the year 1922, acquired control of the Bison Holding Company of Buffalo, which owned the controlling interest in the Niagara Company. On May 15, 1922, his control of the Niagara Company became effective. He thereupon persuaded Burke, a former president, to again become the president of the Niagara Company, and installed two of his representatives in the office of vice president and secretary and treasurer. Marsino's control of the Niagara Company was known to the defendant superintendent. On or about the 4th day of October, 1922, under Marsino's direction, the by-laws were changed so that the checks no longer had to be signed by the president, whom he could not control, but could be signed by the vice-president and by the secretary, treasurer, or any other officer of the company. About this time various local Buffalo people resigned as directors or attorneys or otherwise in connection with this company. Abraham Goldman, Marsino's father-in-law, and other representatives of Marsino, were elected directors. Marsino resigned as director at the request of the defendant superintendent, and was elected general superintendent of agencies. Copies of such change of by-laws and all resolutions and elections and formal actions by the Niagara Company were duly sent to the superintendent.

Marsino also controlled the Warren National Bank of Warren, Mass., which control he acquired January 9, 1923, but this control was apparently unknown to the defendant superintendent.

Marsino also controlled the Mechanics' & Merchants' Bank of Philadelphia, a small and new concern, which opened for business December 26, 1922, but the extent of Marsino's control of this bank was probably not fully known to the superintendent or his representatives until February 5, 1923.

During the summer and fall of 1922, Francis E. Bagot, an attorney and director of the company, Louis L. Babcock, of the firm of lawyers who were then attorneys for the company, F. J. La Guardia, a lawyer from New York, and Burke, president of the company, at various times told the superintendent personally and told his representatives, that Marsino was reliably reported to be a man with a very unsavory record, that there was danger that the funds and securities of the company would be jeopardized if he were permitted to control its affairs.

The defendant superintendent sent his representatives at different times to keep in touch with the affairs of the company. On January 16, 1923, he sent a representative, Mr. Streeter, to Buffalo, to notify the officers of the Niagara Company that no checks should be drawn on funds of the Niagara Company without the approval of Mr. Streeter noted on the check. Mr. Streeter then learned that approximately $100,000 of the company's funds had been deposited, at different times, in the Mechanics' & Merchants' Bank at Philadelphia, of which the New York state insurance department was already suspicious, and about January 19th or 20th notified Mr. Hadley, New York state chief examiner of life insurance companies, representing the superintendent of insurance.

About February 1, 1923, Mr. Hadley learned that a total of about $200,000 of the Niagara Company's money had been transferred to this Mechanics' & Merchants' Bank. On February 5, 1923, he learned that about all of the Niagara Company's deposits had been loaned by the bank on notes which are called dummy notes, and most, if not all, of the sums loaned thereon had presumably passed to Marsino, and that the bank was insolvent. Marsino does not appear to have been indorser on any considerable number of the notes, but some of them bear the indorsement of his vice president or secretary and treasurer of the Niagara Company and of others, either fictitious persons, or persons acting for him. The only collateral for the notes was stock of the Niagara Life Insurance Company.

About February 1, 1923, Mr. Hadley representing the defendant superintendent, had decided to apply to the court for an order under section 63 of the Insurance Law (Consol. Laws, c. 28) to take possession of the property and affairs of the Niagara Company, and papers were in course of preparation for that purpose when, on February 2, 1923 Powell, counsel for the company, came to Hadley at a hotel in Buffalo and asked if application was intended by the department to take over the affairs of the Niagara Company. Upon receiving an affirmative answer, Powell asked for a delay of two days, saying that "we" can take care of the Philadelphia bank matter. The extension was granted, but nothing was done.

On February 5th Marsino's father-in-law, Goldman, a director of the Niagara Company, was brought to Hadley at Buffalo by Francis E. Bagot, acting for the Niagara Company, and endeavored to prevent or delay such action. Goldman was represented to Hadley as a wealthy man who wanted to save the value of his Bison Holding Company stock and to help Marsino, who was also a large holder of the Bison Company stock. Goldman was informed by Hadley that, if he would procure $40,000 in securities to aid the treasury of the Niagara Company, Hadley would withhold the taking of such action for a week. Goldman asked for delay, claiming that friends of Marsino were coming from New York to Buffalo and would bring some money with them in about two days. Hadley declined to wait two days. Goldman then said he had marketable securities of his own in Chicago, and told in a general way what they were, and asked for time to go to Chicago and get them. Hadley, after consul-

tation, said he would not wait for Goldman to go to Chicago and bring back the securities, but that he would go to Chicago with Goldman to get them, and, after some objection on the part of Goldman, they both went to Chicago on the 5th day of February, 1923, and arrived in Chicago on February 6, 1923. Upon arrival in Chicago Goldman did not have the securities which he represented that he had, and offered equity in real estate, which Hadley refused. Goldman's wife then came and said, in the presence of both men, that she had sent the securities to Marsino at Buffalo, according to the testimony of Hadley, but not confirmed by any other witness.

Hadley says he did not believe this, and telegraphed to the representatives of the defendant superintendent of insurance in Buffalo to start the machinery to take possession of the Niagara Company. On the same day, February 6th, an order to show cause was obtained from Supreme Court Judge Dudley at Buffalo, returnable February 7th. Hadley arrived in Buffalo the morning of February 7th, and with other representatives of the defendant superintendent of insurance was informed by Attorney Bagot, claiming to represent Burke, president of the company, and by Powell, counsel for the Niagara Company, that Marsino had about $41,000 of bonds which he would turn over to the company to prevent or defer the taking possession of the property and affairs of the Niagara Company by the superintendent of insurance, if time was given for the obtaining of more money for the Niagara Company. Fowler objected to taking the bonds, and advised immediate action to take possession of the Niagara Company. After some discussion between Hadley, Streeter, Fowler, and Montesano, the latter also an attorney for the superintendent of insurance, on the one hand, and the attorneys Bagot and Powell on the other, in which, by the weight of evidence, Fowler made the statement that it was not wise to take the securities, as they might have been stolen, it was determined by Hadley that the bonds should not be placed in the company's treasury, but that, if the securities could be sold that day and the proceeds paid directly to the Niagara Company the same day, the application to take possession would be deferred for a week.

No inquiry was made of Marsino by any one as to the source or ownership of the bonds. Hadley and Burke, the president of the Niagara Company, went with Marsino, who had the securities, to the office of

O'Brien, Potter & Co., local brokers, and under Hadley's direction arrangement was made to have the securities sold and the proceeds paid the same day by the broker's check directly to the Niagara Company, which was done. Hadley arranged with Marsino that the executive committee of the board of directors of the Niagara Company should pass a resolution authorizing the Niagara Company to deliver to Marsino one of the certificates of deposit issued to the Niagara Company by the said Mechanics' & Merchants' Bank of Philadelphia for $25,000 and a check on the Niagara Company's account in that bank for $14,130.08, the remainder of the proceeds of the sale of the bonds. Powell raised the question that this disposing of the property of the Niagara Company was contrary to the terms of the injunction contained in the order to show cause of February 6, 1923, issued by Supreme Court Judge Dudley, which was returnable on the 7th and had been adjourned. Fowler refused to consent to any modification of the injunction, but the superintendent was called on the long distance telephone and told of the question raised, and, after consultation with Hadley, he advised that the executive committee should go ahead and pass the resolution and give the certificate of deposit and check to Marsino, and he (the superintendent) would see that no proceedings for contempt of court were instituted against the officers or the committee of the company, and sent a confirming telegram upon request of Burke. The resolution was then passed, and the certificate of deposit and check delivered to Marsino, who subsequently received from the Philadelphia bank notes signed by various individuals which had been discounted through his procurement, amounting to about $39,000.

About February 19, 1923, officials of the Warren National Bank opened the box in which its securities were kept and found the whole thereof, amounting to about $200,000, gone, and a memorandum signed by Marsino dated February 6, 1923, stating that the securities had been taken by him for the Bison Holding Company for sale for the account of the Warren bank. This taking was a theft of the bonds by Marsino. A receiver of the Warren bank was appointed February 23, 1923.

No more money or property was put into the treasury of the Niagara Company by anybody, and on February 23d an order was granted by Supreme Court Judge Hinckley, returnable on the same day at 4 p. m., requiring the Niagara Company to show cause

why its affairs should not be liquidated, and why the court should not approve a contract of reinsurance, which had in the meantime been made by the defendant superintendent with the Metropolitan Company, under which the Metropolitan Company would take over the assets of the company, assume its liabilities, and reinsure most of its policy holders. The daily papers of Buffalo on the 22d, 23d, and 24th of February, 1923, contained long articles on the first page, in big headlines, stating that bonds had been stolen from the Warren bank at Warren, Mass. by Marsino, and that some of them had been sold through Buffalo brokers O'Brien, Potter & Co., and the proceeds of the sale had been turned over by Marsino to the Niagara Company.

When the matter came up in court on the afternoon of the 23d, Assistant United States Attorney Selby Smith appeared in court, as a friend of the court, to use his own language, stating that he had been informed by the receiver of the Warren bank that about $41,000 worth of the bonds claimed to have been stolen of the Warren National Bank of Warren, Mass., had been sold and the proceeds turned over to the Niagara Life Insurance Company by a check of O'Brien, Potter & Co.; that these bonds had been disposed of in the presence of some representative of the defendant superintendent. Smith suggested that the court should at least delay matters a few days until he could receive definite instructions from the Attorney General of the United States as to whether or not he desired the institution of a suit to restrain the transfer of the proceeds of these $41,000 of bonds from the Niagara Company to the Metropolitan Company. Mr. Fowler, the representative of the superintendent, was in court on that day, and knew of the statement made by Mr. Smith, but did not recall that anything was said that the bonds had been sold through O'Brien, Potter & Co. The defendant superintendent was also in court, and heard the statement made by Mr. Selby Smith.

The court delayed one day, but on the morning of February 24th granted the order of liquidation and approval of a contract between the superintendent and the Metropolitan Company, despite the objection of Mr. Vaughan, an attorney of Buffalo, representing the plaintiff receiver, who gave notice that the receiver claimed the proceeds of the sale of the bonds. Mr. Fowler, attorney for the superintendent, was present. After the granting of the or-

der, the superintendent left Buffalo on the same day on the Empire State Express, which leaves Buffalo at about 1 o'clock p. m. for New York, having arranged that Mr. Hadley and a representative of the Metropolitan Company should meet him in New York on the arrival of the train at 10 o'clock p. m. on Saturday night, February 24th. He did not find them at the station but at his house in New York City, and about an hour after his arrival he signed the contract of insurance, which had been signed by Mr. Ecker, the vice president of the Metropolitan Company during the afternoon of the same day. The New York Times and the New York Tribune of February 24th contained leading articles on the first page, in large headlines, to the same effect as the statements in the Buffalo papers of February 22d, 23d, and 24th. There had also been similar articles in the issues of the previous two or three days in the New York papers.

About 3 o'clock in the afternoon of February 24th the receiver of the Warren bank sent from Boston, Mass., telegrams to the superintendent of insurance at Albany and the Metropolitan Life Insurance Company at its offices in New York City, notifying them that the receiver of the Warren bank claimed that the proceeds of bonds stolen from the Warren bank were in the treasury of the Niagara Company. A letter to the same effect was sent in the forenoon of the same day from Buffalo by the assistant United States attorney to the Metropolitan Company at its New York office. The plaintiff sent a similar letter the same day to the defendant superintendent. The telegram and letter to the superintendent of insurance was not received by him until the 26th in New York. It is not denied that the letter to the Metropolitan Company was received on February 26th. It is claimed the company has no record of the receipt of the telegram. The contract did not permit the Metropolitan Company to take over the assets of the Niagara Company until four days after the 24th, namely the 28th. The receiver apparently thought that leave of the Supreme Court of the state of New York was necessary to bring this suit, and the suit was brought as soon as leave was obtained. The papers were duly served prior to March 12, 1923. Up to March 12, 1923, the Metropolitan Company had not received the said $39,130.08, and, so far as appears in the testimony, has never received, and the money is still in the custody of the defendant superintendent.

The plaintiff sues to impress a trust upon the said moneys in the possession of the superintendent, on the ground that Marsino was acting as agent of the company in procuring the stolen bonds, and that the Niagara Company could not receive the bonds nor retain the $39,130.08, proceeds of the sale thereof, without assuming the burden of its agent's knowledge that the bonds were stolen; that even if Marsino were not the agent of the company in procuring the bonds, nevertheless the company, the defendant superintendent, and his agents, had such knowledge of Marsino that they should have known that the bonds were stolen, or should have made inquiry to ascertain the source of the bonds, and are therefore chargeable with knowledge; also that the proceeds of the bonds were not acquired in good faith for an adequate consideration or in the regular course of business; that the Niagara Company consequently holds the same as trustee ex maleficio for the plaintiff.

The present defendant superintendent of insurance asserts, as did the former superintendent, that the plaintiff must fail because (1) neither the then defendant superintendent nor the Niagara Company officials, other than Marsino, had any knowledge that the bonds were stolen, and that there was no notice, either actual or constructive, charging them with any knowledge or putting them to inquiry; (2) the Niagara Company took the moneys resulting from the sale of the bonds in partial settlement of an obligation from Marsino to the Niagara Company; and (3) that the Niagara Company gave a present, valuable, and adequate consideration for the $39,130.08.

The Metropolitan Company makes the additional defense that it is an innocent purchaser in good faith without notice, relying on the order of the court, and that its equity is greater than that of the plaintiff, and that it should not be deprived of these moneys for the benefit of the plaintiff.

[1] It is well settled that a principal is chargeable with the knowledge which the agent acquires while acting within the scope of the agent's authority. Curtis Co. v. U. S., 262 U. S. 215, 222, 43 S. Ct. 570, 67 L. Ed. 956; American Nat. Bank v. Miller, 229 U. S. 517, 33 S. Ct. 883, 57 L. Ed. 1310; Fishkill Sav. Inst. v. Nat. Bank of Fishkill, 80 N. Y. 162, 36 Am. Rep. 595; Atlantic Cotton Mills v. Indian Orchard Mills, 147 Mass. 268, 273, 17 N. E. 496, 9 Am. St. Rep. 698.

[2] It is also the law that, where one re-

ceives benefit from the wrongful act of another, and retains the benefit of the wrongful act, after the discovery thereof, he will be deemed to have adopted the wrongful act, or, in other words, when he takes the benefit he takes it subject to the knowledge of the acts by which the benefit was obtained. Fairchild v. McMahon, 139 N. Y. 290, 295, 34 N. E. 779, 36 Am. St. Rep. 701; Fishkill Sav. Inst. v. Nat. Bank of Fishkill, 80 N. Y. 162, 36 Am. Rep. 595; Rockey River Develop. Co. v. German-Amer. Brewing Co., 193 App. Div. 197, 184 N. Y. S. 155; Taylor v. Commercial Bank, 174 N. Y. 181, 188, 66 N. E. 726, 62 L. R. A. 783, 95 Am. St. Rep. 564; Atlantic Cotton Mills v. Indian Orchard Mills, 147 Mass. 268, 275, 17 N. E. 496, 9 Am. St. Rep. 698; Curtis Co. v. U. S., 262 U. S. 215, 224, 43 S. Ct. 570, 67 L. Ed. 956.

[3] It must be taken as true that Marsino stole, from the Warren bank, on February 6th, bonds of which the $41,000, sold in Buffalo on February 7th for $39,130.08, were a part. If he were the agent of the Niagara Company in procuring the bonds which were sold, and the proceeds paid to the Niagara Company, that company should be chargeable with knowledge that they were stolen, and that he was not the rightful owner. It is, of course, true that he had no previous specific, formal authorization by the Niagara Company to get any bonds or moneys for that company. But the state superintendent of insurance was about to apply to the court for an order to take the Niagara Company from the hands of its officers, because of the worthlessness of the deposits of the Niagara Company in the Mechanics' & Merchants' Bank in Philadelphia. Hadley, the defendant superintendent's chief examiner, told Goldman, a director and stockholder of the company and the father-in-law of Marsino, that he must procure for the Niagara Company $40,000 worth of negotiable securities to secure delay for a week in which further betterment of the affairs of the Niagara Company might be had. This information was given on February 5th. Both Goldman and Marsino knew that Goldman had no securities of value in Chicago—Goldman's whole activity was for the purpose of gaining time. Not only did Goldman and Marsino know that something must be done, but Powell, counsel for the company, and Bagot, an attorney connected with the company, and Burke, the president of the company, all knew the situation of affairs. Marsino controlled the company, its administrative officers and executive committee, except Burke.

While Goldman went with Hadley to Chicago on the 5th to gain time, Marsino went on the same day to Warren, Mass., and on the 7th arrived back in Buffalo with $41,000 of negotiable bonds which he had stolen from the Warren bank on February 6th. On the same morning Hadley arrived from Chicago. They were all trying to meet the demands of Hadley to prevent the Niagara Company from being taken out of their hands. On the morning of the 7th, Bagot, Powell, Burke, and Marsino, all of the Niagara Company, knew that Marsino had produced these bonds and urged Hadley to consent that the company take the bonds for the company and defer the application. Hadley, upon the objection of Fowler that the bonds might have been stolen, preferred to do it another way, and decided, as they were negotiable securities, the bonds must be sold and the proceeds paid into the treasury of the Niagara Company, without inquiry upon the part of Hadley or any one else as to where Marsino got the bonds. By its acceptance of the moneys, the Niagara Company ratified all the acts of Marsino, and became chargeable with his knowledge.

Moreover, after the receipt of the moneys, the executive committee of the Niagara Company, which had full authority, passed a resolution accepting the money and directing the delivery of the certificate of deposit on the Philadelphia bank for $25,000 and a check upon the company's supposedly worthless account in the same bank for the remainder of the proceeds of the sale of the bonds. Here was formal ratification of Marsino's act in procuring the bonds and selling them and delivering the proceeds to the Niagara Company. By the receipt of the moneys and the formal ratification of the act of Marsino, Marsino became the agent of the company, with the same effect as if the company had passed a resolution in advance, authorizing Marsino to go out and obtain bonds or moneys to tide over the affairs of the company. With such a relation of agency existing, the company, not having acquired the bonds nor the proceeds of the sale thereof in good faith for an adequate consideration without notice and in due course, was chargeable with the knowledge of its agent Marsino that the bonds were stolen, and it held the moneys as a trustee ex maleficio for the benefit of the true owner of the bonds, the Warren bank and its receivers.

We may go another step and assume that the company was not, on February 7th, the day it received the moneys, chargeable with Marsino's knowledge. But when, upon the application to the court at Buffalo for the order of liquidation, Assistant United States Attorney Selby Smith, on February 23d, and R. C. Vaughan, for the plaintiff herein, on February 24th, made known the claim that the bonds produced by Marsino on the 7th of February were stolen from the Warren bank on February 6th, and that the Niagara Company had no right to receive or hold the proceeds of the sale thereof, the Niagara Company then at least became chargeable with the knowledge which Marsino had that the bonds were stolen. This is so because the Niagara Company still had title to its property and assets, and continued to claim the benefits of Marsino's acts. Under the authorities above cited, the company could not claim the benefits without assuming the knowledge.

[4] The title to its assets, including these moneys, passed from the Niagara Company to the defendant Superintendent of Insurance on the 24th of February, when the justice of the Supreme Court of the state of New York signed the order prescribed in section 63 of the Insurance Law. The defendant superintendent and his attorney were in court on the 23d, and knew of the claim made in behalf of the receiver by Assistant United States Attorney Selby Smith, and the attorney for the defendant superintendent was in court on February 24th, when the order was signed, and heard, before the signing of the order, the claim made by Attorney Raymond C. Vaughan that the plaintiff, receiver, claimed the moneys which were the proceeds of the sale of the stolen bonds. From that day to this the defendant superintendent has claimed and retained the proceeds of the sale of these bonds as a part of the property of the Niagara Company, the legal title to which passed to him on February 24th, and has contested every appealable step in this action to the court of last resort. The defendant superintendent, like the Niagara Company, and in this respect the defendant superintendent merely stands in the place of the Niagara Company, cannot claim the benefits of the fraudulent act of Marsino and escape being chargeable with the knowledge which Marsino had, under the authorities cited.

[5] The defendant superintendent contends that Marsino had an interest adverse to that of the Niagara Company, and that the law therefore does not charge the company with notice of the facts, which the agent, Marsino, not only did not disclose, but which, according to the defendant, he was interested in concealing. The defendant cites American National Bank v. Miller, 229 U. S. 517, 33 S. Ct. 883, 57 L. Ed. 1310; Mayor, etc., v. Tenth National Bank, 111 N. Y. 446, 18 N. E. 618; Bienenstock v. Ammidown, 155 N. Y. 47, 49 N. E. 321; and other cases. The evidence discloses no interest of Marsino adverse to that of the Niagara Company. Their interests were identical, and so defendant's authorities in this respect have no application.

Even if Marsino's interests were adverse to some extent, but would be served along with the interests of the company, the case would rather come within the doctrine stated in Curtis Co. v. U. S., 262 U. S. 215, 224, 43 S. Ct. 570, 573 (67 L. Ed. 956), where the court said: "The adverse interests as between them in sharing the fruits of the common business cannot enable the company to retain its share and repudiate the agent with all he knew." But such adverse interest in sharing the fruits of a common enterprise is not disclosed in the record in this case.

[6] In what has been said, no particular reference has been made to the fact that, since the acts resulting in the sale of the bonds, the receipt of the proceeds, and the delivery to Marsino of the certificate of deposit and the check above referred to, were all under the direction of Hadley, the Niagara Company, the recipient of the benefit, must be chargeable, not only with the knowledge of Marsino, but with the knowledge of Hadley and the other agents of the defendant superintendent.

But the defendant superintendent says in his first defense that he, and that includes his agents, had no knowledge on the 7th of February that the $41,000 par value of bonds sold on that day and the proceeds amounting to $39,130.08 paid to the Niagara Company, were stolen bonds, and no facts were brought to his attention which should have made him chargeable with knowledge or put him to inquiry. The superintendent does not appear to have been in Buffalo at any time from the 5th to the 7th of February, and Hadley was his alter ego, acting in his stead.

The evidence discloses that the defendant superintendent knew these things; that serious charges against Marsino had been made to him by various responsible persons then or formerly connected with the Niagara Company in some capacity, and

some not so connected, and that the superintendent and his representatives had been told that, if they were not very circumspect, Marsino would wreck the company or dissipate its funds; that in October, 1922, the by-laws were changed so that the funds of the company could be withdrawn without the signature of Burke, the president, who had made charges against Marsino; that some reputable Buffalo people had resigned from the directorate about the same time; that on January 16, 1923, Mr. Streeter had been instructed to permit no checks to be drawn on the company's funds without his approval noted on the check; that, despite such precautions, the moneys deposited in the suspicious Mechanics' & Merchant's Bank of Philadelphia had increased from $100,000 to $200,000 within four days and to $210,000 within two weeks; these deposits being as follows:

| | |
|---|---|
| Dec. 26, 1922 | $ 25,000 |
| Jan. 2, 1923 | 50,000 |
| Jan. 15, 1923 | 25,000 |
| Jan. 19, 1923 | 100,000 |
| Jan. 27, 1923 | 10,000 |
| Total | $210,000 |

—that these checks were not signed by Burke, the president, except the last one, the nature of which he says he did not realize when he signed it; that all this money had been obtained from the Philadelphia bank by Marsino on dummy notes, and that the Philadelphia bank was insolvent; that the Bison Holding Company stock, owned by Marsino and Goldman, would be worthless if the Niagara Company was liquidated, and that these two men knew it also; that Goldman had produced none of the securities which he said he had in Chicago; that no explanation was made by Marsino or any one in his behalf of his title to the bonds or the source from which he obtained them; that he had been charged with unlawfully taking securities from banks in the Middle West; that the question of what good it would do the Niagara Company, if the bonds were stolen, was raised by Fowler, the attorney for the defendant superintendent.

This knowledge was sufficient to charge the defendant superintendent with notice, and put him and his representatives to inquiry as to the title of Marsino to the bonds.

Their acts and conduct on that day and subsequently show clearly that they did suspect that Marsino did not own the bonds. They made no inquiry of Marsino or of any one, then or thereafter, as to where Marsino obtained the bonds and whether or not he had title. When question was raised by Fowler that the bonds might have been stolen, Hadley said they were negotiable securities and would pass upon delivery, and that he was going to sell them and take the proceeds. This explains why the bonds were sold and the money paid directly to the company, and why there was insistence upon the very unusual procedure of having it all done on one day. Hadley took the position that if, instead of taking the bonds, the bonds were sold, and the money paid to the company, it would be immune from attack if the bonds turned out to be stolen. To doubly safeguard the matter, Hadley arranged with Marsino for the executive committee to meet and pass a resolution giving Marsino a certificate of deposit and a check on this insolvent Philadelphia bank for the proceeds of the sale to give the transaction the aspect of a purchase. When the objection was made by Powell, counsel for the company, that giving such certificate of deposit and check would violate the injunction contained in the order of Judge Dudley, returnable February 7th, and Fowler refused to consent to modify the injunction, Hadley advised the superintendent to give his assurance that the Niagara Company officers would not be punished for violating the injunction. This the superintendent did.

Such knowledge and such acts point convincingly to a situation in which Hadley strongly suspected that the bonds did not belong to Marsino, carefully refrained from asking for information which would confirm that suspicion, and tried to handle the matter in such a way that the Niagara Company would be immune when the true owner of the bonds tried to recover. The manner in which the thing was done, including the desperate haste to sell the bonds and get the money instead of the bonds in the treasury of the Niagara Company, is consistent only with belief that the bonds were stolen, or at least not the property of Marsino, and that the company could not hold the bonds against the true owner. Doubtless Hadley knew that, if the securities themselves were taken by the Niagara Company, and a claim thereafter made by the true owner, the burden would be on the Niagara Company of showing that it was a holder in good faith, without notice, and for an adequate consideration in due course. Canajoharie Nat. Bank v. Diefendorf, 123 N. Y. 191, 25 N. E. 402, 10 L. R. A. 676; Vosburgh v. Diefendorf, 119 N. Y. 357, 23 N. E. 801, 16 Am. St. Rep. 836; Stewart v. Lansing, 104 U. S. 505, 26 L. Ed. 866. By

taking the cash instead of the securities, Hadley thought he had enabled the Niagara Company and the defendants here to escape that burden.

The case at bar, like the Canajoharie Case, is more significant for what was omitted than for what was avowed. Greater caution in avoiding the most natural information could not have been exhibited by the officials of the company nor by Hadley if they had known the bonds were stolen and desired to remain in ignorance of the facts. Canajoharie Nat. Bank v. Diefendorf, 123 N. Y. 191, 198, 25 N. E. 402, 10 L. R. A. 676; Stewart v. Lansing, 104 U. S. 505, 510, 26 L. Ed. 866.

Burke testified that he believed that the bonds were stolen, but he said nothing about it at the time, and made no inquiry. That is easily explained by the fact that Hadley was master of the situation, and no one desired to displease him, as, if displeased, he might change his mind about giving the Niagara Company and its officers another week.

Bad faith on the part of either the Niagara Company officials or Hadley or the defendant superintendent does not necessarily involve fraudulent motives or moral turpitude. Even if the actual good faith is not questioned, if the facts known should lead to inquiry and by inquiry discovery of the real situation, a person in a commercial sense acts in bad faith, and the law will withhold from him the protection which it would otherwise extend. Ward v. City Trust Co., 192 N. Y. 61, 84 N. E. 585.

The claims of the defendant to offset these conclusions are two: (1) That Hadley supposed these were the bonds which Mrs. Goldman had said on February 6th at Chicago that she had sent to Marsino at Buffalo. (2) That the Niagara Company could not take the bonds because they were not securities in which an insurance company could lawfully invest its funds.

With reference to the first, Hadley says he did not believe Mrs. Goldman when she said it. He made no inquiry of her as to when, or how, or what address, the bonds were sent, nor their kind, amount, etc., nor did he say one word to Marsino as to whether or not these were the bonds which Mrs. Goldman said she had sent, nor how they had come, nor how they could come so quickly from Chicago. When objection was made by Fowler to accepting the bonds and adjourning the court proceedings for a week, Hadley never made any inquiry as to whether or not the bonds were Goldman's. At the office of the broker, Marsino said, with reference to the bonds, "If there isn't enough to satisfy you, Hadley, there are more where these came from," or that in substance. Hadley knew Goldman had no more negotiable securities, for he had seen all the contents of Goldman's box in Chicago. If he thought they were Goldman's bonds, he would not have directed or consented to the giving of the check and the certificate of deposit to Marsino. He would have directed their being given to Goldman.

[7] The second claim also seems a specious plea. It was not a question of investing insurance funds. There were no funds to invest. It was a question of anything to save the insurance company from ruin, not a question of securities. The situation presented is like that of a creditor seeking to make a debtor in desperate circumstances better his account. The creditor does not insist on the receipt of securities which savings banks or trustees might invest in. The creditor is glad to take anything of value to reduce his debt. So here, these securities which had a market value, as demonstrated by the sale on the day in question, of better than $39,000, could and would, under ordinary circumstances, have been gladly taken by the insurance company, whose assets would have thereby been increased by the amount of their market value. They could also have been sold at a favorable time, not under a forced sale, when a greater sum could have been obtained from the sale.

Both of these two contentions of the defendant superintendent seem to have little support in the evidence, and may be dismissed.

For his next defense, the defendant superintendent asserts that the proceeds of the sale of these bonds were received by the Niagara Company in partial discharge of an obligation of Marsino to the company, and that the company has good title thereto. It is doubtless true that, where one in the position of a debtor or converter of the funds of another discharges his obligation in whole or in part by the payment of moneys, the source of which the creditor has no knowledge, and which he has no reason to suspect were procured by theft or fraud on any other person, the creditor may hold the moneys free from any lien or claim of the rightful owner, especially where the creditor has used such moneys. Stephens v. Board of Education, 79 N. Y. 183, 35 Am. Rep. 511; Hatch v. Fourth Nat. Bank of N. Y. City, 147 N. Y. 184, 41 N. E. 403; State

Bank v. United States, 114 U. S. 401, 5 S. Ct. 888, 29 L. Ed. 149. But this doctrine has little application to the case at bar. If it be assumed that a judgment could have been obtained by the Niagara Company against Marsino for procuring the deposit of the Niagara Company's money in the Philadelphia bank and then borrowing the money from that bank on worthless notes, there is nothing in the record to indicate that there was any claim against Marsino on behalf of the Niagara Company in the mind of any one. No demand of any kind was made on Marsino to satisfy any claim which the Niagara Company had or claimed against him, nor was any question made of such a claim. No claim of personal liability was made against any one.

The superintendent was about to take over the company, and Goldman and Bagot inquired in what way it could be prevented or delayed. Goldman was told that only the production of $40,000 in securities would delay it, and that for a week only. When Marsino, on the 7th, produced $41,000 in bonds, no receipt or release of any kind, and no extension or forbearance, as to Marsino personally, was given or mentioned. No diminution of any such liability may be spelled out of the transaction and no credit on account. His obligation, if any, would have been far greater than the $39,000, and a creditor or obligee would not surrender anything which might have value, even a little value, when it had no other security for the debt and no other apparent means of satisfying the remainder of the debt. No certificate would have been given, and no check would have passed until the obligation was entirely liquidated and satisfied. The delivery of the certificate of indebtedness and the giving of the check and the receipt of the moneys of the proceeds of the sale of the bonds had nothing to do with any assumed obligation of Marsino, nor the satisfaction of it in the smallest part. It should be borne in mind that none of the transactions involving the sale of the bonds, the receipt of the moneys and the giving of the certificate and check to Marsino were the result of any negotiations between the Niagara Company and Marsino, nor of any voluntary act on the part of either. Of their own volition neither had much to do with them. The whole thing was something devised by Hadley and carried out under his direction.

The contention that the proceeds of the sale of the bonds were given to and received by the Niagara Company, in partial discharge of an obligation of Marsino to the company is apparently an afterthought, arising from the exigencies of the suit, and was evidently not in the minds of any one at the time of the transactions involved. It is without support in the evidence.

It may be observed also that the defendant superintendent's contention in this respect is inconsistent with his contention, or that of Hadley, his representative, that Hadley believed the bonds produced by Marsino were Goldman's bonds which, according to Hadley, Mrs. Goldman said she had sent to Marsino at Buffalo. If Hadley believed these bonds belonged to Goldman, he could not in good faith arrange for, or consent to, the Niagara Company's accepting them in partial discharge of the liability of another person, viz. Marsino, except at the request or with the consent of Goldman. No such request or consent appears in the record.

The defendant superintendent's contention in this respect is also inconsistent with his next contention, that the Niagara Company gave a present, valuable, and adequate consideration for the $39,130.08, the proceeds of the sale of the stolen bonds, to which contention consideration will now be given.

[8] It is the law that, where a person in good faith, without notice, for an adequate consideration, and in due course of business, receives money or negotiable securities, he takes the money or securities free from infirmities of title or any question as to the vendor's right to dispose of them, and the true owner may look only to the thief or converter of the money or securities. Hatch v. National Bank, 147 N. Y. 184, 41 N. E. 403; Everston v. National Bank of Newport, 66 N. Y. 18, 23 Am. Rep. 9; Manhattan Sav. Inst. v. N. Y. Nat. Bank, 170 N. Y. 58, 62 N. E. 1079, 88 Am. St. Rep. 640.

To give the transaction involved here the appearance of a purchase, the Niagara Company, acting under the direction of the superintendent's representative Hadley, whom it desired to please to avoid the possessory order, passed a resolution authorizing the delivery to Marsino of the $25,000 certificate of deposit on the Philadelphia Bank and a check on the same bank for the sum of $14,130.08, the two aggregating the sum exactly equal to the proceeds of the sale of the bonds. It of course plainly appears from the facts in this case that this was not a voluntary transaction in good faith for an assumed valuable consideration between the Niagara Company and Marsino. There were no negotiations between the Niagara Com-

pany and Marsino. Whatever was done, was done under the direction of Hadley, and, so far as the evidence discloses, there was nothing said and no thought of the surrender of the certificate and the giving of the check until the securities had been sold and the moneys were in the treasury of the Niagara Company. Then, for the first time, was the device adopted by Hadley of delivering the security and the check to give the transaction the aspect of a purchase of the securities from Marsino.

A purchase in the ordinary course of business, for an adequate consideration, and without notice, even from Marsino, might have protected the Niagara Company. But here the sole consideration was the certificate and check on the bank which the superintendent's representatives, and the Niagara Company officers as well, knew, or at least entertained no doubt, was an insolvent bank whose certificate of deposit and a check on which were worthless. No one had the slightest idea that this certificate and this check represented in value $39,130.08, and no effort has been made in this case to show that they had any such value or any value at all. The evidence is that the bank was insolvent, and that the certificate and the check were delivered by Marsino to the bank, and dummy notes to that amount retired. The insolvency of the Philadelphia bank and the worthlessness of the Niagara Company's deposits therein was the reason, and practically the only reason, given by Hadley for the application to take possession of the Niagara Company. Beside this, the certificate and check were delivered in violation of the injunction provision in Judge Dudley's order, which Fowler refused to consent to modify, and which has never been modified.

This is not the kind of transaction in good faith and for an adequate consideration, without notice, in the ordinary course of business. It is difficult to find ordinary course of business in acts restrained by injunction. This transaction lacked both meeting of mind of parties and consideration. There was the form or shell of a purchase, but no substance. This may be characterized as a dummy transaction. So that the facts did not warrant, on the contrary, they negative, any reasonable possibility of finding in this case that this certificate and this check were given to Marsino as a voluntary transaction between him and the company in the ordinary course of business, in good faith and without notice, for the purchase of these securities, or for the receipt of the sum of money representing their sale.

Such position is, of course, inconsistent with the position already discussed that the moneys or the bonds were received in partial discharge of a liability of Marsino. Moreover, it should be observed that such position is also inconsistent with the position heretofore taken by the defendant superintendent that Hadley believed the bonds produced by Marsino on February 7th and sold on that day were the bonds which Mrs. Goldman said she had sent to Marsino at Buffalo.

If Hadley believed that the bonds belonged to Goldman, he could not, in good faith, buy them from, and pay the full purchase price to, Marsino, nor consent that such be done, nor could he direct or consent to the receipt of the proceeds of the sale of Goldman's bonds and the payment of the alleged full consideration therefor to Marsino, without such consent or direction of Goldman. No such consent or direction appears in the record.

One may, of course, take inconsistent positions, and make all the defenses he desires, however inconsistent they may be, but he must take the consequences of his inconsistencies.

It appearing, therefore, that the defendants must fail in their defenses, and that, not only is the Niagara Company chargeable with the knowledge of Marsino that the bonds were stolen, but the defendant superintendent and the Niagara Company officials also had knowledge of such facts that they should have known, and must be deemed to have known, that the Niagara Company could not get good title to the bonds or the proceeds of the sale thereof, it necessarily follows that the Niagara Company held the proceeds of the sale of the bonds as trustee for the Warren bank, the true owner, and that plaintiff has an equitable lien thereon for the amount thereof.

When, by section 63 of the Insurance Law of the state of New York, the title to the property and assets of the Niagara Company passed to the superintendent of insurance under the order of liquidation, he took the assets of the insurance company subject to all claims and liens, including equitable liens, to which they were subject. He could take no better title than the insurance company had. So the funds are subject to the lien of the plaintiff, as receiver of the Warren bank, while in the possession of the Niagara Company and while in the possession of the defendant superintendent.

Even if the Niagara Company could not be held to be a trustee ex maleficio of these moneys, when title to the moneys passed to

the defendant superintendent under the statute, he must be deemed to be holding the funds as trustee ex maleficio because of his own knowledge and acts which resulted in the bonds, which he should have known were stolen, being sold, and the moneys delivered first to the Niagara Company, then to himself as superintendent.

While these conclusions seem the only ones that can reasonably be drawn from the facts of the case, it should be said that the motive which actuated the representatives of the superintendent was not an unworthy one. No personal gain of any kind could come to the superintendent nor his representatives. Their primary thought, no doubt, was the welfare of the policy holders of the Niagara Company. Hadley used these words, "It puts the company in such financial condition that it can be reinsured now, whatever happens." While the superintendent and his representatives are not to be criticized for making the welfare of the policy holders the primary consideration in the acts which they did, the legal result, so far as the chargeability of these funds in the possession of either the Niagara Company or of the superintendent of insurance with a lien in favor of the bona fide owner of the securities is concerned, is not changed. Fortunately the policy holders will not suffer, for the situation here resolves itself into a question of greater right between the Warren bank and the defendant Metropolitan Insurance Company, which received all the assets except this fund, and assumed the obligations of the Niagara Company.

[9] The final question in the case is, Is the equity of the Metropolitan Company greater than that of the plaintiff? The Metropolitan Company claims to be a purchaser in good faith for a valuable consideration, without notice, and that it is entitled to hold these moneys against all the world. The contract between the superintendent and the Metropolitan Company reads in part as follows, the superintendent being the party of the first part:

"I. The party of the first part agrees to deed, assign, set over, and transfer, with good and sufficient conveyances and the appropriate evidences of transfer, to the party of the second part, all of the assets of the Niagara Life Insurance Company, except an amount thereof sufficient to liquidate the business of said company, as more particularly set forth in a schedule hereto annexed, and made a part hereof, known as schedule A, at a value set opposite each such asset, which value shall be controlling for the purposes hereof."

It will be seen that the amount reserved for liquidating the business of the company is not stated, nor is it elsewhere stated in the contract, nor is there any limitation placed on the amount anywhere in the contract.

While it is clear that the Metropolitan Company did not have in mind any claim of the Warren bank or its receiver for an equitable lien on $39,130.08 when the terms of the contract were agreed upon about February 19, 1923, the terms of the contract are sufficiently elastic to include a reservation of sufficient funds to liquidate all the affairs of the company. The amount was not capable of determination at that time. The taking effect of the contract was conditional on the approval of the Supreme Court of New York State.

As has been stated, when the matter came up for approval before the court on the afternoon of February 23, 1923, Assistant United States Attorney Selby Smith informed the court, in the presence of the defendant superintendent and his attorneys, that the receiver of the Warren bank claimed that $39,130.08 of the moneys in possession of the Niagara Company were the proceeds of the sale of bonds stolen from the Warren bank by Marsino and sold through O'Brien, Potter & Co. of Buffalo on February 7th, and Mr. Selby Smith asked the court to delay approval of the contract until he could seek instructions from the Attorney General of the United States about obtaining an injunction restraining the payment of this sum to the Metropolitan Company. The court would adjourn the matter but one day, at which time it was granted. No one representing the Metropolitan Company was in court at that time.

It is to be noted that on such motion the New York Supreme Court had no jurisdiction to pass on the claim of the Warren bank. The Insurance Law provides for the liquidation of an insurance company and the determination by the superintendent of insurance of ordinary claims against such a company. The court doubtless was anxious not to jeopardize the reinsuring of the multitude of policy holders of the Niagara Company, and signed the order with full appreciation that the Warren bank could litigate its claim to a lien on the funds in question in a proper tribunal. Leave to bring this suit was shortly thereafter granted by another judge of that court.

The daily papers in Buffalo on February 22d, 23d, and 24th and the New York Times, New York Sun, and New York Tribune of February 22d, 23d and 24th, carried arti-

cles stating that Marsino had looted the Warren bank of over $200,000 worth of securities, and had sold most of them in Buffalo, and that the Niagara Life Insurance Company, which Marsino also controlled, had received some of the proceeds of the sale of the stolen bonds.

On February 24, 1923, the New York Times contained an article on the front page with heavy headlines at the top of one or more columns reading thus:

"Hope to Save $39,000 of Marsino Thefts.

"Govt. Seeks to Recover for Benefit of Warren Bank."

The article starts as follows:

"Buffalo, Feby. 23. The U. S. Govt. served notice today that it will try to recover for the depositors of the First National Bank of Warren, Mass., $39,000 which was put into the treasury of the Niagara Life Insurance Company by Joseph B. Marsino just before the crash which wrecked the Niagara Life and two banks under Marsino's control. The government acted when application was made in the Supreme Court for an order permitting the state superintendent of insurance to dissolve the Niagara Life Insurance Company and reinsure the policy holders in the Metropolitan Life Insurance Company. * * *"

To the same effect was an article on the front page of the New York Tribune of the same day.

The articles appeared in these New York papers some hours before the court at Buffalo on February 24th approved the reinsurance contract, and almost a whole working day before the contract was signed by the Metropolitan Company in New York City in the late afternoon, after receipt of word that the court had approved the contract.

It is difficult to believe that the attention of the Metropolitan Company, whose office, with its large staff, is in New York City, was not drawn to these articles. Moreover, a telegram was sent from Boston, Mass., about 3 p. m. on the same 24th day of February by the plaintiff receiver to the Metropolitan Company at its New York office, and a like telegram to the superintendent at Albany, making claim to this $39,130.08, and a letter was mailed at Buffalo by United States Attorney Selby Smith on the forenoon of the 24th to the Metropolitan Company, which was received on February 26th, notifying the company that the receiver of the Warren bank claimed as his property the said sum. The Metropolitan Company contents itself with presenting a witness to tell that no record of the telegram can be found in the files of the company. This is not weighty evidence. No denial is made of the receipt of the letter on February 26th.

Beside the extreme probability that the Metropolitan Company knew before signing the contract at 5 to 6 o'clock in the afternoon of February 24th of the claim of the Warren bank, as contained in the leading New York morning papers, there can be no doubt that the company knew of the claim on the 26th, two days before the time fixed for taking over the assets. It could have withdrawn and refused to perform within the two days, on the ground that the superintendent concealed the fact that claim was made to a portion of the assets by the Warren bank. It elected not to do so, but to carry out its contract and take its chances in court of holding the contested sum. Perhaps it believed the question would be determined by the defendant superintendent in liquidation proceedings under the Insurance Law. Having knowledge of the claim of the Warren bank, it did not take the $39,130.08 when it took the rest of the assets of the Niagara Company, but left this sum with the defendant superintendent until the right of the plaintiff was determined.

Knowing, while there was yet time to withdraw from the contract, if not before signing, of the claim of the plaintiff, the defendant Metropolitan Company is not an innocent purchaser in good faith without notice. It stands stripped of its claim of greater equity. It took the fund, or the contract right to the fund, with notice, and now has only the legal standing to require plaintiff to prove his claim. This the plaintiff has done, and the Metropolitan Company, like the defendant superintendent of insurance, must be defeated.

The contention of the defendant Metropolitan Company that it is protected by the order of the court authorizing the contract is untenable. That doctrine has no application to the facts of this case.

[10] The plaintiff claims interest on the deposits from the defendant Superintendent of Insurance. The jurisdiction of this court in this action is limited strictly to the res, and does not run to the person of the superintendent beyond his custody of the res. The superintendent as an individual defendant was stricken out by consent. The plaintiff is entitled to all such interest upon this fund as has accrued and actually been received by the superintendent or which he is entitled to receive. This interest is presumably less than 6 per cent. To allow the plain-

tiff the 6 per cent. against the defendant is to project the judgment of the court beyond the res, and to treat the suit as if it were in personam as well as in rem. It would not be just to require the superintendent to pay out of his own pocket a sum represented by the difference between the interest received and the interest at 6 per cent., and this is especially so since the present defendant superintendent, who must obey the decree of the court, is not the same person who, as superintendent, did, or required to be done, the things which resulted in the sale of the bonds and the taking of the proceeds thereof by the Niagara Company. Neither the former nor the present superintendent had or has any personal interest of any kind in this fund.

There is no proof in this case as to what interest has accrued from this fund. Unless the parties agree thereon, proof may be offered, and the plaintiff may have decree, impressing the lien upon the fund, together with such interest as has accrued thereon running to the defendant superintendent, directing the payment of the fund and interest to the plaintiff receiver, restraining the superintendent from paying it to the Metropolitan Company, and restraining the Metropolitan Company from accepting the fund from the superintendent, with costs against the defendants.